**Kenneth R. WADE, Plaintiff/Appellant,**

v.

**Georgene S. WADE, Defendant/Appellee.**

Court of Appeals of Tennessee,
Eastern Section.

July 21, 1994.

Order on Denial of Rehearing
Dec. 5, 1994.

Permission to Appeal Denied by
Supreme Court April 3, 1995.

Charles H. Child, Wm. T. Magill, Layman, O'Connor, Petty & Child, Knoxville, for appellant.

L. Caesar Stair, III, Bernstein, Stair & McAdams, Knoxville, for appellee.

## OPINION

LEWIS, Judge.

This appeal is by plaintiff Kenneth R. Wade (Husband) from the trial court's final judgment of divorce and the trial court's order granting defendant Georgene S. Wade (Wife) temporary support during the appeal. Husband appeals from so much of the final judgment of divorce as awards Wife certain property as a division of the marital estate and awards Wife "as alimony the sum of $15,000.00 to be applied to her attorney fees to be paid by the husband to her attorney of record." Husband presents the following issues for our review:

I. [Whether] the evidence preponderates against the trial court's classification and subsequent division of the marital estate.

   A. [Whether] the trial court erred in holding that appreciation of stock owned by the Husband prior to the marriage was marital property.

   B. [Whether] the trial court erred in classifying the Victoria Mall Partnership, Kelco/Waco and the 4+ acres of Emert's Cove as marital property for purposes of the property division.

II. [Whether] the trial court erred in requiring the Husband to pay the Wife alimony to be applied to her attorney's fees.

III. Whether the trial court erred in awarding Mrs. Wade alimony pendente lite pending the appeal.

IV. Whether Mrs. Wade is entitled to full interest on assets awarded to her as alimony when she has been receiving payments in lieu of her obtaining these assets.

Wife presents two additional issues for our review:

I. [Whether] the trial court erred in ordering a grossly inequitable division of the marital estate in favor of Husband;

II. [Whether] the trial court erred in failing to award Wife rehabilitative alimony.

## I.

### FACTS

The pertinent facts are as follows. These parties were married for thirteen years, from 1979 to 1992. This marriage was the second for each of the parties. Husband had a daughter, Katherine Alexis Wade, who was five years old at the time the parties married. Wife had a son, Jay Ray Stevens, who was almost seven at the time the parties married. Both children lived with the parties throughout the marriage.

During their marriage, the parties first lived in Kingsport, Tennessee, then moved to Manila, Philippines, then moved to Sevierville, Tennessee, and finally moved to Knoxville, Tennessee. Both Husband and Wife worked throughout the marriage.

When the parties married in 1979, Husband was employed by Mason–Dixon Truck Lines in Kingsport and earned approximately $22,000.00 per year. Wife was living in Knoxville prior to the marriage and had completed all of her course work for her doctorate in educational administration and supervision. Wife moved to Kingsport when the parties married and shortly thereafter was employed by the Tri–Cities State Technical Institute as coordinator of public relations at a salary of $16,000.00 per year.

When the parties married, Husband owned a home and an adjacent lot at 108 Leslie Court in Kingsport. When Husband sold this home he made a profit of approximately $64,000.00, which he placed in a Sevier County Bank account in his sole name. Husband also owned a quarter interest in two acres in Emert's Cove in Sevier County. He owned some stocks and municipal bonds, and as of the date of the marriage, he owed his father approximately $32,688.00.

Wife, at the time of the parties' marriage, had approximately $5,000.00 to $10,000.00 excess from the sale of her home in Knoxville. She had used part of the proceeds of the sale to pay for her education. She also owned furniture and household goods.

Approximately two years after the marriage, Husband realized he did not have a secure future with Mason–Dixon due to the company's financial problems.[1] In 1981, Wife was offered a job in the Philippines in her field, international education. The parties agreed that they would move to the Philippines and allow Wife to pursue her career, because they would still have Husband's inheritance for their retirement years.

In May 1981, Wife accepted the position of Professional Development Specialist at the International School in Manila, Philippines. The position initially paid $20,000.00, but Wife was later promoted to Director of Cur-

---

1. Mason–Dixon filed for bankruptcy in 1984.

riculum and Instruction and by 1985 was earning $26,000.00 to $27,000.00. The school also provided the parties with a home, electricity, and free tuition for their children at the school.

Husband did not work the first six months they lived in Manila; however, after six months he obtained a position with Hospital Corporation of America (HCA). He initially earned only $500.00, per month, but by August 1982 his earnings had increased to $33,-000.00 per year. In his last year at HCA, 1985–1986, Husband earned approximately $42,000.00 to $43,000.00 as a consultant.

Furthermore, while the parties resided in Manila, two of Husband's brothers' children lived with them for an extended period, in addition to their own children. One nephew, Zachary, lived with them for six months, and one niece, Holly, lived with them for an entire school year. Also in addition to her other duties and responsibilities while in the Philippines, Wife devoted time to purchasing furniture and other household goods from all over the Far East.

In 1986, Wife was offered a position in Katmandu as head of the Lincoln School, but Husband wanted to return to Tennessee. Through Husband's brother, Gary Wade, Wife was offered the position of head of the Greenbriar Academy, a small, private school in Sevierville. As a result, Wife gave up her career in international education and returned to Sevierville with her son Jay in the early summer of 1986. Alexis followed shortly thereafter. Husband stayed in the Philippines, however, until late December 1986. Both children attended Greenbriar Academy during the 1986–87 school year. Because of Wife's position with the school, neither child was required to pay tuition.

Wife's career as headmistress of Greenbriar Academy was short-lived. The school had been experiencing difficulties before Wife's employment, but she was told that at least fifty students would be enrolled during the 1986–87 school year. However, the school only enrolled thirty students during the school year and was $13,000.00 in debt. Wife did eliminate the $13,000.00 debt, but also spent a vast amount of money on the school and its students. Furthermore, Wife

testified she was paid only $2,000.00 or $3,000.00 for the 1986–87 school year, rather than the $20,000.00 she had first expected.

While Wife was running Greenbriar Academy, she was also in charge of renovating 121 Joy Street, a residence the parties had purchased from Husband's brother, Gary, and his cousin. This home was directly across the street from Husband's parents and next door to his brother, Sid Wade, in Sevierville. Wife testified that she was at the construction site every day. She further testified that she swept up after the builders, paid the suppliers, and selected, purchased, and decorated everything for the house. The evidence is abundant that she managed the entire remodeling of the home at 121 Joy Street. After Husband returned from the Philippines in late December 1986, the parties and the children moved into the 121 Joy Street residence.

Also after Husband returned, he entered into a business venture with his brother Gary on a fifty-fifty basis. This venture was a convenience store/gasoline business known as Kelco/Waco. Wife did not want Husband to go into business with his brother, and she never signed any of the loans for the financing of Kelco/Waco. Husband's only cash investment in the business was $1,000.00, which came from "his" Sevier County Bank account. Husband earned $40,000.00 per year for the first three years of his employment. At Wife's insistence, Husband asked for and received a pay increase in 1990 to $50,000.00. At the time of the trial in 1992, Husband was earning $55,000.00 per year, and the company also provided him with an automobile, gas, insurance, maintenance and repairs, and medical insurance.

Wife alleges that she supported and helped Husband in the business. She specifically alleges she answered the phone, helped hold buckets while Husband emptied the coins at the car washes, wrapped the coins, went to oil marketeer meetings, washed out car wash bays, read trade magazines, went to food shows, and worked in one convenience store making hamburgers. She further alleges she learned all about the business and offered suggestions to Husband. Based on the

record before us, the evidence presented at trial supports Wife's allegations.

At the end of the 1987 school year, Wife did not have a job and had no opportunity for employment in her field of education administration in Sevierville. On 19 October 1987, the day of the "Wall Street crash", Wife was employed by Merrill Lynch as a financial consultant, earning $24,000.00 per year. Wife subsequently passed the Series 7 test and was licensed as a financial consultant. Moreover, through a two-year home study program, she became a certified financial planner.

While Wife was employed at Merrill Lynch, she persuaded Husband to open a business account for Kelco/Waco at Merrill Lynch; however, Gary, Husband's brother and co-venturer, refused to sign the documents to open the account. The business earned approximately $10,000.00 in interest during the first year of the account. The business account at Merrill Lynch was complicated, and Wife spent a lot of time with Kelco/Waco's bookkeeping and working out problems with the account. Wife testified that she monitored the Kelco/Waco account every day while employed at Merrill Lynch.

Also during Wife's employment at Merrill Lynch, she managed Husband's cash management account. She "made a few trades, not much" in his account. Wife also managed Alexis' account of approximately $10,000.00, which Alexis had inherited when her Uncle Sid died. Wife doubled Alexis' $10,000.00 in less than a year.

In 1987, both of the children were enrolled in Webb School of Knoxville and remained there until they graduated. Wife took the children to school every day and picked them up at least three days per week. The trip from Sevierville to Webb School takes approximately one hour and fifteen minutes each way. Eventually the parties purchased a one bedroom condominium located in the Pembroke Building in Knoxville so Wife and the children would not have to commute from Sevierville every day. Wife testified that although the condominium lessened their travel from Sevierville to Knoxville, she then had to furnish two residences and keep food at both residences. Wife and the children would stay at the Pembroke residence two or three nights a week, and Husband would sometimes travel to Knoxville after work to stay with his family. When the parties purchased the Pembroke condominium, they also purchased a parking privilege. In September 1989 the parties purchased a home at 1925 Cherokee Boulevard in Knoxville. Wife decorated and furnished the home, and the parties and the children lived there until the parties' separation on 29 July 1991.

In August 1990 the parties invested in Premier Travel, a travel agency in Knoxville. In March 1991 Wife left Merrill Lynch to operate Premier Travel, attempting to make it a success and to protect the parties' investment. From March 1991 to March 1992, Wife worked full-time at Premier Travel without pay. From March 1992 until the time of trial, she was paid $100.00 per week for her work at Premier Travel. The parties loaned Premier Travel $15,160.00, and they now own 51% interest in the company. However, Wife now argues their 51% interest is worthless.

During their marriage, the parties maintained separate banking accounts. During the first two years of their marriage, the parties contributed a pro rata portion of their respective earnings to a joint account, which was used to run their household and pay their common family expenses. Wife took her remaining money and put it in a cash management account (CMA) at Merrill Lynch, which was in her name only, and Husband deposited his remaining money in an account at the Sevier County Bank. Wife testified that during 1981–1982, while the parties were living in the Philippines, they lived solely off of her income. After Husband became employed with HCA in August 1992, the parties pooled their money, paid their household and living expenses, and then split the excess.

Wife also testified that from May or June 1986 until late December 1986, Husband gave her no money to live on, while overseeing the construction and renovations at the 121 Joy Street residence, working full time without pay at Greenbriar Academy, and taking care of the children. Wife testified that

Husband gave his father money for renovating the house, and she had to get money from Husband's father for the renovations.

When Husband started working at Kelco/Waco, Wife testified that Husband paid the mortgage, but she had to pay for all of the food and other family expenses out of her CMA account. While Wife worked at Merrill Lynch, Husband paid the house note and utilities and gave Wife $600.00 per month for the remaining household expenses. Wife testified that because Husband gave her only $600.00 per month, she spent a vast amount of money from her CMA account on the family expenses, especially on expenses for the two children. Also when Wife worked at Merrill Lynch, Husband closed his Sevier County Bank account and deposited those funds into "his" CMA account. From the parties' separation on 29 July 1991 until the date of trial, Husband gave Wife no money. Wife has lived off of "her" CMA account, a withdrawal of $4,800.00 from their line of credit, and her earnings of $100.00 per week from Premier Travel.

During the marriage, Husband purchased a quarter (¼) interest in 4 plus acres in Emert's Cove, Sevier County, Tennessee from his brothers. He paid $7,965.08 for his interest in the Emert's Cove property, which amount was paid from "his" account at Sevier County Bank. No appraisals of this property were introduced at trial; however, Husband valued the property at $40,000.00 on various financial statements from 1986 to 1991. The trial court valued the interest in Emert's Cove at $15,000.00.

Also during the marriage, Husband and his brothers, Dwight, Jr., Gary, and Sid, entered into a Wade Brothers Partnership to renovate an old two-level store (hereinafter Victoria Mall) in downtown Sevierville. Husband paid for his share, approximately $12,-000.00, out of "his" Sevier County Bank account, and the brothers borrowed the remaining money, approximately $300,000.00, from their father. Husband valued Victoria Mall at $96,000.00 on his 14 December 1991 financial statement. The court valued Husband's Victoria Mall interest at $75,000.00.

As previously noted, Husband owned a ⅛ acre unimproved lot, 110 Leslie Court lot, at the time of the parties' marriage. The lot appreciated $10,000 during the marriage. Wife argues that while the parties lived in Kingsport, she gardened on this lot and that Husband paid the property taxes throughout the marriage from either the Sevier County Bank account or "his" CMA account. Wife admits that the lot is Husband's separate property, but argues that the $10,000.00 appreciation is a marital asset.

Husband also received gifts from his parents throughout the marriage. These gifts were made in the form of forgiveness on notes. Wife argues the gifts were made to "Ken and family," of which she was a part. At trial, Husband's father, Dwight Wade, Sr., produced a ledger in which he noted all of his gifts and loans to his son. The ledger shows that Husband owed his father $32,668.70 at the time of his marriage to Wife. On 28 March 1978, Husband's father had made a gift to him and his daughter Alexis in the amount of $12,000.00. The ledger then reflects the following gifts after the parties' marriage:

| Date | Item | Credit | Balance |
|---|---|---|---|
| 09/25/79 | "Xmas" present | $ 12,000.00 | - $ 20,045.20 |
| 07/02/80 | "Xmas" present | $ 12,000.00 | - $ 1,489.86 |
| 07/25/83 | Manila Pouch—Gift from Dad & Mom from Dad & Mom | $ 5,000.00 | + $ 5,000.00 |
| 11/08/88 | For Xmas | $ 10,000.00 | - $ 17,264.00 |
| 03/14/89 | For Present | $ 10,000.00 | - $ 2,754.56 |
| 12/85 | Xmas | $ 10,000.00 | - $ 2,878.51 |
| 12/07/89 | Xmas | $ 30,000.00 | - $ 54,608.51 |
| 01/01/90 | Xmas | $ 40,000.00 | - $ 14,608.51 |
| 01/01/91 | Xmas | $ 40,000.00 | + $ 8,614.90 |
| 01/01/92 | Xmas | $ 40,000.00 | + $ 43,324.83 |

Husband's father reluctantly admitted the gifts were made to Husband and his family. The ledger reflects that Dwight Wade, Sr. made a loan of $75,000.00 to Husband for Kelco, Ltd. on 28 April 1989. The ledger also shows that Husband's father made another debit entry on Husband's account of $25,000.00 for Kelco on 17 April 1990. The ledger further indicates that Kelco has been making monthly payments of $795.00 to Husband's father since 1 January 1991, even though the ledger now shows that Husband has a positive account balance with his father and thus owes him no money. The ledger does not reflect any gifts or loans to Husband for the renovation of Victoria Mall.

Furthermore, Husband valued "other" bonds on his financial statements from 31 December 1986 to 14 December 1991 at $117,000.00. Both Husband and Wife valued the bonds at $117,000.00 on their Rule 10 filings submitted to the trial court; however, the trial court failed to address the $117,000.00 in bonds in its Memorandum.

Five months after Husband filed for divorce, he and his brother Gary started a business known as Panapple, Inc., which operates an International House of Pancakes in Pigeon Forge, Tennessee. Husband and his brother each took a total of $40,000.00 out of Kelco/Waco to start the business. Husband owns a 20% interest in Panapple. Both Husband and his brother admitted that taking $80,000.00 from Kelco/Waco reduced the equity in that business by that amount. Husband also took $8,000.00 from "his" CMA account to invest in Panapple, thus giving Husband a total investment of $48,000.00 in Panapple.

Each of the parties had adulterous relationships during the marriage. Husband admitted that he had an affair with a Filipino woman during the time he remained in the Philippines and Wife lived in Sevierville.

Husband testified, however, that he and Wife "acknowledged to each other that gee, if over a period of eight months, thirteen thousand miles apart, if something happens, we really wouldn't hold it against each other in the course of the marriage, if another involvement happened, if the involvement didn't threaten the marriage, so to speak." Husband further testified that he disclosed his indiscretion to his Wife when he returned to the States, that she accepted it, and that she indicated she had exercised the liberty herself. Wife also began an adulterous affair with the parties' Premier Travel business partner, Don Darbyshire. Wife and her paramour kept a journal, which was introduced at trial, that explicitly detailed their relationship. This adulterous relationship eventually led to the dissolution of the marriage.

This matter was tried on 8 October and 9 October 1992. On 1 December 1992 the trial court issued a Memorandum Opinion, which was incorporated into the Final Judgment of Divorce, entered on 18 December 1992. In its Memorandum and Final Judgment of Divorce the court found and ordered the following:

## I.

The Court finds having reviewed all the evidence, that a divorce should be awarded in this matter. Neither party in this cause has been perfect, however, it is clear Mr. Wade is the party with the lesser degree of fault. Therefore, the husband shall be awarded an absolute divorce from the wife upon the grounds of inappropriate marital conduct.

## II.

The husband shall retain his separate property as follows:

1.) Two (2) acres of Emerts Cove Road in which husband has ¼ interest.

2.) 110 Lesley Court Kingsport, Tennessee

3.) Personal clothing, jewelry and personal papers, books, etc. . . .

4.) Base stocks owned prior to marriage *excluding* appreciation during the marriage, to wit:

AT & T
Bell South
First American
General Motors

International Paper
Mobil Corporation
Sevier County Bank

5.) Maturing Municipal Bonds

---

### III.

The wife shall retain her separate property as follows:

1.) Personal clothing, jewelry and personal papers, books, etc.
2.) Her automobile purchased since the separation.

---

### IV.

The Court finds the following to be the marital property of the parties:

|  | Court's evaluation: |
|---|---|
| 1.) 1925 Cherokee Boulevard—(Homeplace) Knoxville,Tennessee 37919—Equity | $ 91,700.00 |
| 2.) 121 Joy Street Sevierville, Tennessee 37862 | $ 91;178.50 |
| 3.) 508 Union Avenue—(Condo Unit) Knoxville, Tennessee parking space | $ 66,270.00 |
| 4.) ¼ interest in 4+ acres in Emerts Cove, Pitman Center, Tennessee Wife's evaluation—$40,000.0 Husband's evaluation—$15,000.00 | $ 15,000.00 |
| 5.) Fidelity Capital Appreciation IRA 478.14 shares— | $ 7,338.71 |
| 6.) Fidelity Magellan Fund IRA 256.69 shares | $ 18,360.82 |
| 7.) World Income Fund (IRA)— | $ 185.00 |
| 8.) Equitable Capital PTR (IRA)— | $ 4,000.00 |
| 9.) Zero Coupons (IRA) 8,160 shares— | $ 2,703.00 |
| 10.) G.T. Global Europeon 87 shares— | $ 798.00 |
| 11.) Kelco Ltd. (Waco, Inc.) 50%— Wife's evaluation—$275,000.00 Husband's evaluation—$100,000.00 | $273,900.00 |
| 12.) Premier Travel Services— Wife's evaluation—$0.00 Husband's evaluation—$25,000.00 | $ 0.00 |
| 13.) Pannapple L.P. 20%— invested from Kelco, Ltd. Wife's evaluation—$40,000.00 Husband evaluation $0.00 | $ 0.00 |
| 14.) Husband's Merrill Lynch CMA— | $ 34,000.00 |
| 15.) Husband's Sevier County Bank— | $ 200.00 |

Court's evaluation:

16.) Notes receivable from Premier Travel
Totaling—$15,160.00
(collection questionable)
C.D. pledged to Airline Reporting
Corporation—$10,000.00 $ 15,160.00

$ 10,000.00

17.) Wife's 50,000 shares Audio Visual
Communication
Wife's evaluation—$0.00
Husband's evaluation—$50,000.00 $ 0.00

18.) Wife's Merrill Lynch CMA account $ 11,955.79

19.) Wife's IRA at Merrill Lynch
CMA $ 20,748.22

20.) Household furniture and furnishings

21.) Stocks—Appreciation value only since 1979.

| | | |
|---|---|---|
| AT & T | 100 shares | $ 5,567.50 |
| Bell South | 225 shares | |
| First American Corporation | 600 shares | $ 6,000.00 |
| General Motors Corporation | 300 shares | $ 8,100.00 |
| Mobil Corporation | 1320 shares | $ 30,855.00 |
| Sevier County Bank | 16 shares | $ 7,200.00 |
| International Paper Corporation | 100 shares | $ 2,150.00 |

22.) Wade Brothers Partnership—
Victoria Mall
Wife's evaluation—$96,000.00
Husband's evaluation—$75, 000.00 $ 75,000.00

---

The Court finds that although the business interest to wit Kelco/Waco was formulated during the marriage, the proof shows the respondent wife made no contribution to acquisition, enhancement or appreciation thereof. In fact the Court finds she hampered the efforts of the husband in this regard.

The Court further finds she made no contribution to the acquisition, enhancement or appreciation of the Victoria Mall partnership. The proof indicates funding for acquisition came from the funds of the husband and gifts from his father.

The Court likewise finds the wife has made no substantial contribution to the acquisition of the 4+ acres of Emerts Cove.

## V.

Insofar as a division of this marital estate is concerned, the Court makes the following division, after considering all the proof and weighing the evidence as to land values and business values (which were disputed with wide discrepancies in each parties' evaluation):

The wife shall be awarded the following:

1.) 1925 Cherokee Boulevard
Knoxville, Tennessee
subject to the mortgage thereon $ 91,700.00

2.) 508 Union Avenue
Knoxville, Tennessee
with parking place $ 66,270.00

3.) Wife's Merrill Lynch CMA $ 11,955.79

4.) Wife's IRA at Merrill Lynch $ 20,748.22

5.) Premier Travel notes
receivable of the parties $ 15,160.00
$ 10,000.00

plus C.D. pledged to Airline
Reporting Corporation.

| | |
|---|---|
| 6.) Premier Travel | $ 0.00 |
| 7.) Stocks: | |
| Fidelity Capital (Appreciation) | $ 7,338.71 |
| Fidelity Magellan Fund (IRA) | $ 18,360.82 |
| Work Income Fund (IRA) | $ 185.00 |
| Equitable Capital PTR (IRA) | $ 4,000.00 |
| Zero Coupons | $ 2,703.00 |
| G.T. Global European | $ 798.00 |
| 8.) 50,000 shares Audio Visual common stock | $ 0.00 |
| 9.) Cash as further property division to be paid by the husband. | $ 35,000.00 |

---

## VI.

The husband shall be awarded the following:

| | |
|---|---|
| 1.) 121 Joy Street Sevierville, Tennessee— | $ 91,178.50 |
| 2.) Kelco Ltd. (Waco, Inc.) | $273,900.00 |
| 3.) Panapple, L.P. | $ 0.00 |
| 4.) Husband's Merrill Lynch CMA | $ 34,081.13 |
| 5.) 4+ acres Emerts Cove— | $ 15,000.00 |
| 6.) Wade Brothers Partnership Victoria Mall | $ 75,000.00 |
| 7.) Stocks: (Appreciated value during marriage) | |

| | |
|---|---|
| AT & T and Bell South | $ 5,567.50 |
| First American Corporation | $ 6,000.00 |
| General Motors Corporation | $ 8,100.00 |
| International Paper Corporation | $ 2,150.00 |
| Mobil Corporation | $ 30,855.00 |
| Sevier County Bank | $ 7,200.00 |

8.) He shall retain the proceeds from the stolen Mercedes. Disposed of prior to Trial. $10,264.50

. . . .

10.) Wife will be awarded as alimony the sum of $15,000.00 to be applied to her attorney fees to be paid by the husband to her attorney of record. In the event there is any balance due to her attorney of record, the same shall be her responsibility.

---

Husband appealed from the Final Judgment of Divorce, and Wife asked the trial court for temporary support pending the appeal. The court subsequently ordered Husband to pay Wife $550.00 per month as temporary support, retroactive to 1 January 1993 and ordered Husband to pay Wife $750.00 for her attorney's fees. Husband then appealed from the order awarding Wife temporary support and attorney's fees.

Husband argues the evidence preponderates against the trial court's classification and division of the marital estate. Husband specifically argues the trial court erred in holding that appreciation of stock was marital property, when he owned the stock prior

to the marriage, and that the trial court erred in classifying the Victoria Mall partnership, Kelco/Waco, and his one-quarter interest in the 4 plus acres of Emert's Cove as marital property. Husband also argues the trial court erred in requiring Husband to pay Wife alimony to be applied to her attorney's fees. Finally, Husband argues the trial court erred in awarding Wife alimony pendente lite pending this appeal and that Wife is not entitled to full interest on assets awarded to her as alimony, because she has been receiving payments in lieu of obtaining these assets.

Wife also insists the marital estate division was inequitable. Wife argues the court misconstrued Wife's contribution, as defined by state law, to the acquisition, preservation, and appreciation of the following assets: Kelco/Waco; Victoria Mall; Emert's Cove; and the appreciation and value of Husband's stocks. Wife further argues the court erred in failing to award her rehabilitative alimony.

## II.

### The Division of Property

Both Husband and Wife take issue with the trial court's division of property. Husband insists that the trial court erred in classifying specific assets as marital rather than separate, and each of the parties insists that the distribution of the marital estate was inequitable. We find that the trial court erred in dividing the property inequitably and modify the trial court's opinion as set forth below.

■ As this court noted in *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn.App.1988), because Tennessee is a "dual property" jurisdiction, trial courts must first classify the parties' property as either separate or marital before equitably dividing the marital estate. Thus we must first determine whether the trial court correctly classified the parties' property. Tennessee Code Annotated section 36–4–121 sets forth the definitions of separate and marital property. Separate property is defined as:

   (A) All real and personal property owned by a spouse before marriage;

   (B) Property acquired in exchange for property acquired before the marriage;

   (C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1); and

   (D) Property acquired by a spouse at any time by gift, bequest, devise or descent.

Tenn.Code Ann. § 36–4–121(b)(2) (1991).

Marital property is defined as:

all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date.

(B) "Marital property" includes income from, and any increase in value during the marriage, of property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation and the value of vested pension, retirement or other fringe benefit rights accrued during the period of the marriage.

(C) As used in this subsection, "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine.

Tenn.Code Ann. § 36–4–121(b)(1) 1991).

The trial court awarded the following property to Husband as his separate property: two acres in Emert's Cove in which Husband has a quarter interest; 110 Leslie Court; personal clothing, jewelry and personal papers, books, etc.; base stocks owned prior to the marriage *excluding* appreciation during the marriage; and maturing municipal bonds. Wife was awarded the following property as her separate property: personal

clothing, jewelry, and personal papers, books, etc.; and her automobile purchased since the separation. Based on the record before us, we find that the trial court properly classified the parties' property.

### A. Stock Appreciation, Victoria Mall Partnership, Kelco/Waco, Emert's Cove

■ Husband contends that the trial court erred in failing to classify the appreciation of the stocks he owned prior to marriage as his separate property. Husband argues that Wife did not "substantially contribute" to the preservation and appreciation of these stocks as is required by Tennessee Code Annotated section 36–4–121(b)(1)(B). We disagree.

Husband attempts to support his argument by citing to three opinions decided by this court. In those opinions, *Sherrill v. Sherrill,* 831 S.W.2d 293 (Tenn.App.1992); *Guthrie v. Guthrie,* No. 01–A–01–9106–CH–00221, 1991 WL 244462, 16 TAM 51–11 (Tenn.App. 22 Nov. 1991); *Crews v. Crews,* 743 S.W.2d 182 (Tenn.App.1987), the court determined that the party seeking a share in the appreciation of the other party's separate property had not made a substantial contribution to the preservation and appreciation of the separate property. The cited opinions are distinguishable from the instant case.

This court affirmed the trial court's finding in *Sherrill* that:

the Wife failed to show that any contribution she may have made as a parent or homemaker had any direct or indirect connection whatsoever to the preservation and appreciation of the Husband's Krystal Company stockholdings. The [c]ourt [found] there [was] no relationship, direct or indirect between the Wife's parenting or homemaking contributions and the increase in the Krystal Company stock.

*Sherrill,* 831 S.W.2d at 295. We find, however, that in the case at bar, Wife made direct and indirect contributions to the preservation and appreciation of Husband's stock.

This court also found in *Guthrie* that there was "nothing in the record to show that the Husband made any direct contribution to the appreciation of Wife's inheritance. If any-

thing, his efforts may have been an impediment to appreciation." *Guthrie,* 1991 WL 244462 at * 2. The facts in *Guthrie,* however, are distinguishable from the facts before us. In *Guthrie,* the parties used Wife's inheritance to purchase homes and for living expenses. *Id.* at * 1. In the present case, the record shows that Husband was never required to use any of his stock or dividends for living expenses. In fact, when the parties first moved to the Philippines, Husband did not work; yet, he was not required to use any of his separate assets for living expenses because Wife supported him with her earnings. Thus, Husband's stock continued to appreciate due to Wife's support.

Tennessee Code Annotated section 36–4–121(b) provides that the income from and increase in value of separate property will be considered to be marital property subject to division if each party substantially contributed to the separate property's preservation and appreciation. Husband contends that Wife made no substantial contribution to the preservation and appreciation of his stocks. This court determined in *Mahaffey v. Mahaffey,* 775 S.W.2d 618 (Tenn.App.1989) that:

Substantial contributions are ones which are real and significant. They need not be monetarily commensurate with the appreciation in the property's value during the marriage....

Likewise, the contributions need not be directly related to the specific property involved. They are substantial if they enabled the spouse who owns the property to retain it during the marriage. Thus, Tenn. Code Ann. Sec. 36–4–121(b)(1) provides that a substantial contribution can include "the direct or indirect contribution of a spouse as homemaker, wage earner, parent, or family financial manager, together with such other factors as the court having jurisdiction thereof may determine."

*Id.* at 623.

This case is unusual in that Wife substantially contributed to the stocks' preservation and appreciation not only by her indirect contributions as homemaker, wage earner, parent, and family financial manager, but also by her direct contributions. While Wife worked at Merrill Lynch for three-and-one-

half years, she monitored Husband's stocks on a daily basis. Although it is disputed as to whether Wife made a few trades in these stocks, she nevertheless watched them on a daily basis, regularly discussed the stocks with Husband, and advised Husband when to buy, sell, or hold the stocks.

Based on the foregoing, we affirm the trial court's finding that the appreciation in Husband's stock is marital property and thus subject to division.

■ Because the trial court properly classified the parties' property, we will now address the issue of whether the trial court made an equitable division of the marital estate. We note at the outset of this analysis, trial courts have broad discretion in dividing the marital estate, and thus their decisions are entitled to great weight on appeal. *Mondelli v. Howard*, 780 S.W.2d 769, 772 (Tenn.App.1989). Furthermore, the trial court's decision is presumed to be correct unless the evidence preponderates otherwise. *Id.*

Tennessee Code Annotated section 36–4–121(c) sets forth the factors the court must consider in making an equitable division of the parties' marital property. This section reads:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be

given the same weight if each party has fulfilled his or her role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party; and

(10) Such other factors as are necessary to consider the equities between the parties.

Tenn.Code Ann. § 36–4–121(c) (1991). Furthermore, Tennessee Rule of Appellate Procedure 13(d) "requires us to review each record de novo, and, if outcome-affecting errors are found, Tenn[essee] R[ule] [of] App[ellate] P[rocedure] 36(a) requires us to grant the relief to which the parties are entitled." *Mondelli*, 780 S.W.2d at 772–73.

■ Both Husband and Wife argue that the trial court did not make an equitable division of the marital estate. Husband argues that because the trial court found that Wife "made no contribution to the acquisition, enhancement or appreciation" of the Victoria Mall partnership, Kelco/Waco, and the four plus acres in Emert's Cove, these properties and their respective values should not be included in the division of the marital estate. Wife argues that she did contribute to the "acquisition, enhancement, or appreciation" of the Victoria Mall partnership, Kelco/Waco, and the four plus acres of Emert's cove, and, therefore, the trial court erred in awarding these assets solely to Husband without adjusting her share in the marital estate proportionately.

We find the trial court properly found that Husband's interest in the Victoria Mall partnership, Kelco/Waco, and the four plus acres of Emert's Cove was marital. However, the trial court erred in finding that Wife "made no contribution to the acquisition, enhancement or appreciation" of the Victoria Mall partnership, Kelco/Waco, and the four plus acres of Emert's Cove. We further find that the trial court erred in failing to divide the parties' marital property equitably. We,

therefore, modify the trial court's division of the marital estate as set forth later in this opinion.

The main contention in each of the parties' argument concerning the division of the marital estate centers on whether the value of Husband's interest in the Victoria Mall partnership, Kelco/Waco, and four plus acres in Emert's Cove should be considered as part of the marital estate. Husband made an investment in each of these properties after the parties married. The trial court found each of these three assets to be marital assets. However, the trial court then found that Wife made no contribution to the acquisition, enhancement, or appreciation of any of these three assets. We are perplexed by this finding. Tennessee Code Annotated section 36–4–121(b)(1)(B) requires a finding that a spouse substantially contributed to the preservation and appreciation of an asset only if the asset would have otherwise been deemed separate property, not when the property is classified as marital by the court. We thus find that the trial court correctly classified these assets as marital and then erred by awarding the assets solely to Husband, causing an inequitable division of the marital estate. We base this finding on the following.

Prior to the parties' marriage, Husband owned a residence at 108 Leslie Court. Husband received $64,000.00 from the sale of this residence, which he deposited into "his" Sevier County Bank account after the parties' marriage. Husband thus insists throughout his argument that this Sevier County Bank account contained funds which were his separate property and thus anything purchased with those funds were his separate property. We agree with that portion of Husband's argument. However, at trial Husband testified that with the funds from the Leslie Court sale, he purchased $31,000.00 of stock, which was placed in his CMA account, and used $35,000.00 for the renovations and purchase of the Joy Street residence. Thus according to Husband's own testimony, those two purchases exceeded the amount he deposited into his Sevier County Bank account as his separate funds.

■ The record further shows that after the parties married in 1979, Husband deposited a portion of his earnings into "his" Sevier County Bank account. However, this fact does not make those earnings Husband's separate property; whatever Husband earned during the marriage, regardless of the bank account into which it was deposited, remains marital property.

■ The evidence further shows that the Victoria Mall, an old department store in downtown Sevierville, was purchased by Husband and his three brothers as a partnership during the marriage. The trial court found that "[t]he proof indicates funding for the acquisition [for Victoria Mall] came from the funds of the husband and gifts from his father." If the trial court had been correct in its finding, then Victoria Mall should have been classified as separate property. However, the trial court earlier found that this asset was marital, and we agree for the reasons set forth below.

First, Husband made an initial investment in the partnership of $12,000.00, but that investment, as we have previously noted, could not have been made with the separate funds Husband deposited in his Sevier County Bank account. Furthermore, Husband's father's detailed ledger lists no loans from father to Husband for the acquisition or renovation of Victoria Mall. Thus, it shows no gifts in the form of forgiveness on notes regarding Victoria Mall.

Moreover, after the parties married in 1979, the gifts Husband's parents made were the maximum tax free gift possible without being required to file a gift tax return, and Husband's father reluctantly admitted that the gifts were made to "Ken and his family."

Based on the foregoing, the $12,000.00 Husband invested in the Victoria Mall partnership came from his marital earnings, which he had deposited into his Sevier County Bank account. Thus, Victoria Mall was correctly classified as marital property and is subject to division.

■ We further find that Husband's interests in Kelco/Waco and the four plus acres of Emert's Cove are marital. The $1,000.00 initial investment Husband made for his fifty

percent (50%) interest in Kelco/Waco and the $14,500.00 he paid for his interest in the Emert's Cove property came from "marital earnings." With regard to Kelco/Waco, the trial court found: "[A]lthough the business interest to wit Kelco/Waco was formulated during the marriage, the proof shows the respondent wife made no contribution to [the] acquisition, enhancement or appreciation thereof. In fact the Court finds she hampered the efforts of the husband in this regard." The court classified Kelco/Waco as marital property, but awarded it solely to Husband.

Husband notes that Kelco/Waco was started after the marriage on borrowed money with the exception of $1,000.00 contributed by himself and $1,000.00 from his brother and partner Gary Wade. Husband contends that Wife refused to sign any notes for the purchase or improvement of the business, refused to contribute any money into the business, and had no dealing with the business. The record shows that Wife did not want Husband to enter into this business with his brother, but she reluctantly agreed to Husband entering into the business. Wife contends, however, that she learned about the business, made suggestions to Husband concerning the business, and even assisted Husband with some of his duties for the business when called upon to do so. Wife further contends that she persuaded Husband to open a business account at Merrill Lynch for Kelco/Waco, and as a result, the business earned over $10,000.00 in interest in the first year of the account.

Even if Wife had no dealings with Kelco/Waco, as Husband contends, it is still a marital asset subject to division pursuant to Tennessee Code Annotated section 36–4–121(b)(1)(A). Thus, we find the trial court properly classified Kelco/Waco as marital property, but erred in failing to equitably divide the marital estate.

▮ We make the same finding with regard to Husband's interest in the four plus acres in Emert's Cove. This asset was properly classified as marital property. Husband's interest was purchased with marital earnings, yet the trial court found that "Wife made no substantial contribution to the ac-quisition" of this asset and accordingly awarded it solely to Husband.

Throughout this marriage, Wife always worked outside the home; raised her son and Husband's daughter; and renovated, decorated and furnished the parties' homes in Manila, at 121 Joy Street in Sevierville, at 1925 Cherokee Boulevard in Knoxville, and their Pembroke condominium. Wife has served as homemaker, wage earner, parent, and family financial manager. However, in dividing the marital estate, the trial court awarded Husband $559,296.63 in assets and ordered him to pay the debt on the Merrill Lynch equity line of approximately $50,-000.00. The trial court awarded Wife $284,-219.54 in assets, which included $35,000.00 cash as further property division to be paid by Husband, along with $15,000.00 alimony *in solido* for attorney's fees.

▮ Tennessee Code Annotated section 36–4–121 requires the trial court to divide marital property equitably in accordance with the statutory factors without regard to fault. However, the trial court's distribution need not be equal to be equitable. *Batson,* 769 S.W.2d at 859. Generally, courts judge the fairness of a property division by its final results. *Thompson v. Thompson,* 797 S.W.2d 599, 604 (Tenn.App.1990). Based on the final results of this property division and the factors set forth in Tennessee Code Annotated section 36–4–121(c), we find the trial court's division of the marital estate to be inequitable.

## B. Modifications

The trial court awarded Wife $284,219.54 as her share in the marital estate and awarded Husband $559,296.63 as his share in the marital estate. We modify the trial court's order as follows.

First, we note that Husband testified that $35,000.00 from the sale of his Leslie Court residence, which was indisputably Husband's separate property, was used to renovate the 121 Joy Street residence. The court, therefore, should have awarded Husband $35,-000.00 from the Joy Street residence as his separate property. *See* Tenn.Code Ann. § 36–4–121(b)(2)(B). Thus, Husband's share

in the marital estate is reduced by $35,-000.00, decreasing Husband's property division to $524,296.63.

Furthermore, both Husband and Wife listed $117,000.00 in bonds as property on their proposed property divisions that were submitted to the trial court. Husband listed these bonds on his Financial Statements from 31 December 1986 to 14 December 1991. The trial court, however, totally disregarded this asset. The trial court's property division thus should be modified to include these bonds as part of Husband's marital property. This award increases Husband's marital property award to $641,296.63. This award, however, causes the property division to be even more inequitable.

We, therefore, modify the trial court's property division and award Wife $150,000.00 additional cash as further property division to be paid by Husband. This modification produces an equitable division of the parties' marital estate. Wife is thus awarded $434,-219.54 and Husband is awarded $491,296.63 as their respective shares in the property division.

### III.

#### Alimony

■ We now address the issues regarding alimony. Husband first argues that the trial court erred in requiring Husband to pay Wife alimony to be applied to her attorney's fees. Based on the enumerated factors set forth in Tennessee Code Annotated section 36–5–101(d) and the modified property division, we agree.

This court recognized in *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn.App. 1992), that "[a]s with any alimony award, in deciding whether to award attorney's fees as alimony *in solido*, the trial court should consider the relevant factors enumerated in T.C.A. Sec. 36–5–101(d)." Tennessee Code Annotated section 36–5–101(d) reads as follows:

(d)(1) It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). Rehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony. In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age, and physical and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36–4–121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn.Code Ann. § 36–5–101(d) (Supp.1993).

The factors set forth above require us to reverse the trial court's award of alimony in the amount of $15,000.00 to be applied to Wife's attorney's fees. Moreover, we have modified the trial court's property division and Wife now has a sufficient award from which to pay her attorney's fees. As this court has stated in numerous opinions, "If the final decree awards Wife sufficient funds out of which her needs and counsel fees can be reasonably met, then an award of attorney's fees is inappropriate." *Barnhill v. Barnhill,* 826 S.W.2d 443, 456 (Tenn.App. 1991) (citing *Franklin v. Franklin,* 746 S.W.2d 715 (Tenn.App.1987); *Ingram v. Ingram,* 721 S.W.2d 262 (Tenn.App.1986); *Duncan v. Duncan,* 686 S.W.2d 568 (Tenn. App.1984)). Based on the foregoing, we find the evidence preponderates against an award of attorney's fees and thus reverse this portion of the trial court's decree.

■ Second, Wife argues that the trial court erred in failing to award Wife rehabilitative alimony. As Wife cited in her brief, the most important factor to consider in awarding alimony is the need of the recipient spouse. *Lancaster v. Lancaster,* 671 S.W.2d 501, 503 (Tenn.App.1984). Based on the factors enumerated in Tennessee Code Annotated section 36–5–101(d), which we previously quoted, and the modified property division, we find Wife has no need for rehabilitative alimony and affirm the trial court on this issue.

Husband makes the final argument regarding alimony. Husband argues the trial court erred in awarding Wife alimony pendente lite pending the appeal of this cause.

■ After Husband filed his Notice of Appeal with this court, Wife filed a motion seeking temporary support during the pendency of Husband's appeal. The trial court entered an order awarding Wife $550.00 per month as temporary support during the appeal, retroactive to 1 January 1993. The trial court further taxed the costs against Husband and ordered him to pay Wife $750.00 for Wife's attorney's fees incurred in seeking the temporary support.

Rule 62.03 of the Tennessee Rules of Civil Procedure gives the court discretion to grant whatever additional or modified relief is deemed appropriate during the pendency of an appeal. This court has upheld the award of temporary alimony where the recipient spouse was not at liberty to use the property she was awarded for her support until the final determination of the appeal. *Hensley v. Hensley,* 631 S.W.2d 131, 135 (Tenn.App. 1981). Wife, in the instant case, had available for her use and support few of the assets she was awarded. The trial court based the award of alimony pendente lite "on the proof that it's necessary for her support because the appeal effectively stays the division of property" and because Husband earns "quite a bit more than [Wife who] is technically below the poverty level."

Wife proved her need for temporary support pending this appeal, and Husband has the ability to pay Wife temporary support pending this appeal. The granting of temporary support pending the appeal was within the discretion of the trial court and will not be disturbed on appeal. However, as we previously determined, Wife now has the ability to pay her own attorney's fees per our modifications to the property division. Therefore, that portion of the trial court's order is reversed.

## IV.

### Interest

■ Husband's final issue is: "Whether Mrs. Wade is entitled to full interest on

assets awarded to her as alimony when she has been receiving payments in lieu of her obtaining these assets." We hold that Wife is entitled to interest at the statutory rate on the assets awarded to her from the date of the original divorce decree.

Husband argues that his payment of temporary alimony to Wife is in lieu of Wife obtaining control of the assets she was awarded, and, therefore, those payments should be applied to any interest awarded by the court, so as to preclude double recovery to Wife. We disagree.

Alimony pendente lite was not awarded to Wife in lieu of Wife obtaining control of the assets awarded to her. Rather, the temporary alimony was awarded based on Wife's need and Husband's ability to pay.

Furthermore, it is the rule in Tennessee that "when a judgment is rendered in the trial court originally or by direction from the appellate courts, the statute [Tenn.Code Ann. Sec. 47–14–121] provides that the judgment shall automatically accrue interest at the statutory rate unless the court specifies that 'its action requires that interest be computed other than as required by statute.'" *Inman v. Alexander,* 871 S.W.2d 153, 154 (Tenn.App. 1993). This court has further held that "judgment on appeal, when recorded in the Appellate Court, stands in the place of the judgment of the Trial Court, and the legal situation is as if the judgment so recorded had been originally rendered by the Trial Court." *Inman v. Inman,* 840 S.W.2d 927, 932 (Tenn.App.1992). Therefore, Wife is entitled to the statutory interest on the trial court's judgment as modified by this opinion.

In *Inman v. Inman,* this court and the Supreme Court modified the trial court's division of the marital estate, and the Wife was awarded cash, real property, stocks, bonds, and a note. *Inman v. Inman,* 840 S.W.2d at 931. This court found that the Wife should be granted statutory interest on the cash award as well as principal, interest, dividends, and rent on the other assets, all from the date of the divorce decree. Wife in this case is entitled to the same consideration. Husband has enjoyed the use, control, and benefit of the marital assets that have not been transferred to Wife during this appeal.

Thus, the trial court should hear evidence and render judgment in favor of appellee/Wife for the statutory interest on the trial court's judgment as modified by this opinion. The interest should be computed from the date of the divorce decree until the delivery of each asset to appellee/Wife.

The judgment of the trial court is affirmed in part, reversed in part, modified and remanded to the trial court for entry of a judgment in conformity with this opinion and for any further necessary proceedings. Costs on appeal are taxed to the appellant, Kenneth R. Wade.

IRVIN H. KILCREASE, Jr., Special Judge, and KOCH, J., concur.

## ORDER

Plaintiff/appellant Kenneth R. Wade, hereinafter referred to as Husband, filed a Petition for Rehearing with this court. In his petition, Husband alleged that "the [c]ourt's opinion incorrectly states the material facts established by the evidence and set forth in the record, and/or the [c]ourt's opinion overlooks or misapprehends material facts." Husband also filed a Motion for Consideration of Post–Judgment Facts, in which he requested this court to consider the sale of Premier Travel by the Wife, Georgene S. Wade, for $50,000.00 in its decision of whether to rehear this matter. Both the trial court and this court awarded the aforementioned asset to Wife, but assigned a value of zero to it.

Husband alleges the following in his Petition for Rehearing. First, Husband alleges "this [c]ourt's opinion incorrectly states the material facts established by the evidence and set forth in the record with regard to certain bonds purportedly owned by the Husband valued at $117,000.00 on the parties' Rule 10 filing submitted to the [t]rial [c]ourt." Second, Husband alleges that "this [c]ourt's opinion incorrectly states the material facts established by the evidence and set forth in the record and/or overlooks or misapprehends a material fact with respect to the gifts made to the Husband." Third, Husband alleges that "certain material facts . . .

occurred after the [t]rial [c]ourt's judgment and while this appeal was pending." Therefore, based upon the Husband's conclusion that this "[c]ourt's [o]pinion incorrectly states the material facts established by the evidence and set forth in the record and/or overlooks or misapprehends material facts," Husband requested a rehearing.

This court's statement of the facts is accurate and supported by the record; therefore, appellant's petition should accordingly be denied.

## I

■■■ With respect to Husband's first argument, this court correctly included the bonds valued at $117,000.00, which the trial court disregarded in the Husband's marital property. Husband listed these bonds separately on his financial statements from 1986 through 1990. Appellant valued "maturing municipal bonds" at $180,000.00 and "other bonds" at $117,000.00 on his financial statements. This court thus relied upon the Husband's own documents in modifying the trial court's order.

Husband contends that the $117,000.00 in bonds and certain other bonds, valued at $180,000.00, are actually the same bonds, and he quotes passages from his brother's testimony, which was not included in the abridged record, to this effect. At trial, Husband argued that the bonds valued at $117,000.00 existed, but that the municipal bonds valued at $180,000.00 did not exist. Now, on appeal, Husband contends that the $180,000.00 in bonds exists, but that the $117,000.00 in bonds are nonexistent. However, Husband's own financial statements from 1986 through 1990 have both sets of bonds listed separately. It was not until 1991, after he had filed his complaint for divorce, that the Husband deleted the bonds valued at $117,000.00 from his financial statements.

Husband further contends that his father holds the bonds in an estate planning scheme and that he was uncertain of the amount of the bonds until he began to prepare for the division of property in the divorce underlying this appeal. When he was questioned concerning how he arrived at the figures he included in his financial statements, Husband answered that he and his brother Gary put together his first financial statement very quickly and that he transferred those amounts to subsequent financial statements. Husband included both sets of bonds not only on his financial statements from 1986 through 1990, but also on his Rule 10 filing which he submitted to the trial court. Gary Wade, Husband's brother, testified that his father, Dwight Wade, Sr., could conclusively testify as to the amount of the bonds that he holds for Husband. In referring to whether there was one or two sets of bonds the trial court stated: "This is a different turn here than what both of you all have on your list and I'm assuming that neither one of you all know this and we are going to have to have it straightened out by the witness." Dwight Wade, Sr., subsequently testified at the trial; however, he was not questioned concerning the amount of bonds at issue.

Thus, the record before us is extremely perplexing. Before modifying the trial court's order with respect to the bonds, we thoroughly examined the record before us. After carefully reviewing the exhibits and the testimony at trial, we concluded that the bonds valued at $117,000.00 should be included in the Husband's marital property.

Following the filing of this petition to rehear, this court again reviewed the record, and in light of the record before us and all of its discrepancies, we have determined that it was not error to include the bonds valued at $117,000.00 in the Husband's marital property. Although both sets of bonds were included on Husband's financial statements and on his Rule 10 filing submitted to the trial court, Husband, at times, contended at trial that the bonds valued at $180,000.00 did not exist. However, the trial court found those bonds to be the separate property of appellant and failed to mention the bonds valued at $117,000.00. Now, on appeal, Husband contends the trial court disregarded the $117,000.00 in bonds, because that asset is nonexistent. Furthermore, it was the municipal bonds valued at $180,000.00 that Husband deleted from his financial statement after filing for divorce, not the "other bonds" valued at $117,000.00.

After a careful and thorough review of the record, we deny Husband's petition as to this issue.

## II

Husband next contends that this court incorrectly stated the material facts established by the evidence and set forth in the record and/or overlooked or misapprehended a material fact in our opinion with respect to the gifts made to the appellant/husband.

■ We have carefully reviewed the testimony of Dwight Wade, Sr., and the arguments made by the Husband. Husband contends that when Dwight Wade, Sr., reluctantly admitted the gifts were made to Husband and his family, he was referring to Husband and his daughter, Alexis, as the "family" to which the gifts were intended. However, we cannot agree that when Husband's father reluctantly admitted that the gifts were made to "Ken and his family" that Husband's Wife was not a part of that family. In fact, when Dwight Wade, Sr., was questioned concerning the gifts to his other sons and their families the father replied as follows.

Q. And again if you made a $12,000.00 gift to Gary, was that to Gary and his wife to avoid the tax?

A. And family, yes. I always put the family.

Q. And I take it when you made the gifts to Ken, they were to Ken and his family?

A. Yes.

Several times during cross-examination Dwight Wade, Sr., admitted the gifts he gave to Ken were to Ken and his family. The natural and ordinary meaning of the phrase "to Ken and his family" includes Wife. Furthermore, Husband/Appellant contends that because his father made a gift to "Ken and Alexis" on 28 March 1978, which was noted in his father's journal, every gift from that point forward was made to Ken and Alexis. However, the 1978 gift was made prior to the parties' marriage. We find it interesting that subsequent to the parties' marriage in 1979, there were no further notations that labeled the Christmas gifts "to Ken and Alexis," but the gifts continued to be for the maximum tax deductible amount for two people. Moreover, as we have noted earlier, Dwight Wade, Sr., admitted on cross-examination that the gifts were made "to Ken and his family."

This court's finding that gifts from the Husband's father were made to both the Husband and the Wife is amply supported by the record. The Husband's father began giving these gifts to the couple as early as two months after the parties were married, making the maximum tax-free gift possible, to two people, without being required to file a gift tax return.

Based on our review of the record, we deny Husband's petition as to this issue.

## III

■ Finally, Husband contends that this court should rehear this matter because certain material facts occurred after the trial court's judgment and during the pendency of this appeal. Pursuant to Rule 14 of the Tennessee Rules of Appellate Procedure, Husband also filed a Motion for Consideration of Post–Judgment Facts with respect to this matter. Specifically, Husband contends that his attorney has been advised that Wife has sold Premier Travel for $50,000.00, which was awarded to her by the trial court with a valuation of zero dollars. Husband argues that "[c]learly, the valuation [of Premier Travel] was incorrect if, in fact, this asset were sold for $50,000.00 as believed and the court's division of the marital property should be adjusted accordingly."

First, we note that we agree with Wife/Appellee that Husband has submitted an affidavit by his attorney containing double hearsay and that Husband's attorney failed to demonstrate any personal knowledge of any sale of Premier Travel. Furthermore, Tennessee Rule of Appellate Procedure 14 may not be used to relitigate the value of an asset, even if that value has changed, as was explicitly held in *Duncan v. Duncan*, 672 S.W.2d 765, 768 (1984). The trial court has already considered testimony and other evidence regarding the value of Premier Travel, as it did for all the assets at issue in this case. Considering any post-judgment change in value of Premier Travel would open the door to reconsidering the value of all the assets that

were divided between the parties, since the value of all the assets changes over time. In *Duncan v. Duncan,* 672 S.W.2d at 768, the Tennessee Supreme Court explicitly forbade such use of Rule 14, which it held "amounts to an attempt to relitigate the issue of value, a purpose outside the scope of the rule."

The rationale for the rule stated in *Duncan* is evident. The value of most assets changes over time. Reopening the evidence for one asset would lead to reopening the evidence for all assets as their value fluctuates. If this court were to accept Husband's position with regard to Premier Travel, it may also have to reopen the proof with regard to the assets awarded to Husband, which have undoubtedly fluctuated since the initial proof was heard. Therefore, based on Tennessee Rule of Appellate Procedure 14 and the Rule as enunciated in *Duncan,* we decline to disturb the finality of the valuations of the assets in this case.

We thus deny Husband's Petition for Rehearing with respect to this matter and deny Husband's Motion for Consideration of Post–Judgment Facts.

Based on the foregoing, it is therefore ordered that appellant's Petition for Rehearing be and is denied in all respects and that appellant's Motion for Consideration of Post–Judgment Facts be and is hereby denied.