IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 18, 2008 Session

**CAROL ANN VICK WATSON**
**v.**
**FRANK LEE WATSON, JR.**

**Appeal from the Chancery Court for Shelby County**
**No. CH-01-2398-1      Walter L. Evans, Chancellor**

_____

**No. W2007-02735-COA-R3-CV - Filed May 27, 2009**

_____

This is the second appeal in this divorce case. The husband is a lawyer and the wife was a homemaker during most of the marriage. After the divorce trial, the trial court divided the marital estate, awarded the wife transitional alimony, and ordered each party to pay his or her own attorney's fees. The wife appealed and the husband cross-appealed. In the first appeal, the appellate court reversed the trial court's valuation of two marital assets, stock and a corporation, and remanded for the trial court to re-value those assets. In addition, the trial court's decision regarding the husband's alleged dissipation of marital assets was reversed, and that issue was remanded to the trial court for reconsideration as well. The issues raised on alimony and attorney's fees were not addressed in the first appeal. On remand, the trial court found a debt owed by the corporation to the husband was uncollectible and determined that the value of the corporation was zero. The trial court adjusted the valuation of the wife's interest in the stock and engaged in a detailed analysis of the husband's alleged dissipation of marital assets, finding no dissipation. On remand, the wife sought an award of alimony *in futuro*. The trial court declined to award alimony *in futuro* but awarded the wife an additional year of transitional alimony. Finally, the trial court declined the wife's request for her attorney's fees. Both parties now appeal. We affirm the trial court's finding that the husband did not engage in dissipation, affirm the trial court's increased property award to the wife, reflecting her interest in the stock, reverse the trial court's finding that the value of the corporation is zero, and remand to the trial court for valuation of the corporation and division of that asset, modify the trial court's award of alimony by awarding the wife alimony *in futuro* when the transitional alimony ends, affirm the trial court's refusal to award the wife her attorney's fees, and order the award of post-judgment interest on the wife's increased property award from the stock, dating from the date of the judgment on remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part,**
**Reversed in Part, Modified, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S, and J. STEVEN STAFFORD, J., joined.

David E. Caywood and Holly Jackson Renken, Memphis, Tennessee, for the Plaintiff/Appellant Carol Ann Vick Watson

Sam Berry Blair and Betty Campbell, Memphis, Tennessee, for the Defendant/Appellee Frank Lee Watson, Jr.

# OPINION

## FACTS AND PROCEDURAL HISTORY

This is the second appeal in the divorce of Plaintiff/Appellant Carol Ann Vick Watson ("Wife") and Defendant/Appellee Frank Lee Watson, Jr. ("Husband"). The facts in this case are more fully set forth in our first opinion. *See Watson v. Watson*, No. W2004-01014-COA-R3-CV, 2005 WL 1882413 (Tenn. Ct. App. Aug. 9, 2005).

Wife filed the initial complaint for divorce and Husband counterclaimed. At the time of the divorce trial below, Husband was sixty-three years old and Wife was fifty-six years old. Husband is a shareholder with the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz, earning in the range of $300,000 per year. Wife had been employed as a securities and commodities trader some twenty years earlier, but upon the parties' agreement quit to stay home and care for the parties' learning-disabled son. The parties' marital assets included the marital home, ten units of Vining Sparks IBG stock, and a corporation owned by Husband, Randell Corporation. During the marriage, Husband became romantically involved with a paralegal in his law firm; Wife asserted that Husband's expenditures related to this relationship were a dissipation of marital assets.

After the trial, the trial court filed its findings of fact and conclusions of law on February 17, 2004, and entered the final decree of divorce on March 17, 2004. The trial court, *inter alia*, divided the marital estate and awarded Wife transitional alimony in the amount of $6,000 per month for the first three years and $3,000 per month for the next three years. Each party was ordered to pay his or her own attorney's fees. Wife appealed the trial court's decision and Husband cross-appealed.

In the first appeal, the trial court's valuation of a marital asset, Randell Corporation,[1] was reversed, and the issue was remanded. *Id.* at *14. Specifically, the trial court was asked to consider on remand the value of a receivable asset of Husband in the form of a debt owed by Randell Corporation to Husband. *Id.* In the first appeal, it was noted that the report of the special master appointed by the trial court to make a recommendation on Randell Corporation showed a negative asset value for Randell Corporation of approximately negative $119,000. *Id.* at *9. The negative value was predicated on Randell Corporation's indebtedness to Husband in the amount of approximately $419,000; however, the trial court did not include the receivable as an asset of Husband. *Id.* This was found erroneous and reconsideration was directed on remand.

---

[1]Randell Corporation is a commodities trading and cattle ranch operating entity located on substantial acreage in Mississippi.

The trial court's valuation of another marital asset, Vining Sparks IBG stock was also reversed. *Id.* at *14. In determining the net value of the stock, the trial court deducted the tax consequences of a sale of the stock, despite Husband's testimony that he did not intend to sell the stock but would instead borrow the money to pay Wife for her interest in it. *Id.* at *10.

The trial court's decision relating to Husband's alleged dissipation of marital property was reversed on appeal as well. *Id.* at *14. After the divorce trial, the trial court determined that any dissipation of marital assets by Husband would not be considered in the distribution of the marital estate, noting that during the time period in which Husband allegedly dissipated marital funds, he provided monies to Wife that exceeded the amount allegedly dissipated. *Id.* at *12. The appellate court interpreted this as indicating that the dissipated marital funds would not be considered because of the monies Husband provided to Wife during the separation. This reasoning was found to be erroneous, and the issue was remanded for the trial court to analyze Husband's alleged dissipation in accordance with this Court's opinion in *Ward v. Ward*, No. W2001-01078-COA-R3-CV, 2002 WL 31845229 (Tenn. Ct. App. Dec. 19, 2002). *Watson*, 2005 WL 1882413, at *14. Finally, because the case had been remanded for reconsideration of issues affecting the distribution of marital property, the appellate court declined to address issues relating to the alimony award to Wife or the trial court's refusal to award her attorney's fees. *Id.*

On November 6, 2007, the trial court entered its findings and order on remand. The trial court recognized the $419,000 loan to Randell as a receivable of Husband, but determined that Randell was unable to pay Husband the $419,000 it owed him. It found that selling Randell's assets to satisfy its indebtedness to Husband would cost more than $300,000 in taxes, closing costs, and real estate brokerage fees. This meant that, upon liquidation, Randell would have a negative value, and there would be no money to pay Husband. In light of this finding, the trial court reaffirmed its prior determination that the value of Randell was zero and that Randell was unable to pay Husband the $419,000 debt. As to the Vining Sparks IBG stock, the trial court adjusted its valuation of one-half of the stock from a net value of $38,500 to $51,500. This new value included the $13,000 that the trial court had previously deducted as a tax consequence of selling one-half of the units of stock.

On remand, the trial court also engaged in a careful *Ward* analysis of Husband's alleged dissipation of marital assets. In light of its detailed analysis, the trial court determined that Wife failed to establish a prima facie case of dissipation, so the burden never shifted to Husband to show that the expenditures at issue were appropriate. The trial court noted that even if Wife had established a prima facie case, the expenditures would not constitute dissipation under the *Ward* analysis. In the alternative, the trial court found that, even if the expenditures constituted dissipation, this would not change its distribution of the marital estate.

In the proceedings on remand, Wife sought an award of alimony *in futuro* instead of transitional alimony, noting Husband's substantial earnings and the fact that she had largely been out of the workforce for twenty years. The trial court did not award alimony *in futuro*, but awarded Wife an additional year of transitional alimony in the amount of $3,000 per month. The trial court declined to revise its previous order denying Wife an award of attorney's fees. Wife then filed a timely notice of appeal to this Court.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Wife raises the following issues:[2]

> 1. Whether the trial court erred in finding that Husband did not engage in dissipation of the parties' assets.
> 2. Whether the trial court erred in confirming its prior determination that the value of Randell is zero and that Randell is unable to pay the debt owed to Husband.
> 3. Whether the trial court erred in its distribution of the marital property.
> 4. Whether the trial court erred in the amount and duration of alimony awarded to Wife.
> 5. Whether the trial court erred in failing to award attorney's fees and expenses to Wife.
> 6. Whether the trial court erred in failing to award post-judgment interest on the modification of the value of the Vining Sparks IBG stock awarded to Wife.

Husband also raises two issues for our review. He asks us to consider whether the trial court erred in awarding Wife an additional $13,000 for her interest in the Vining Sparks IBG stock and whether the trial court erred in awarding Wife seven years of transitional alimony.

Because this case was tried by the trial court sitting without a jury, we review the trial court's findings of fact *de novo* upon the record with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001). Some of the trial court's factual findings are based on its determinations of the credibility of the witnesses. This Court affords "great deference" to the trial court's credibility determinations. ***Keaton v. Hancock County Bd. of Educ.***, 119 S.W.3d 218, 223 (Tenn. Ct. App. 2003) (citation omitted). Questions of law, however, are reviewed *de novo* with no presumption of correctness. ***S. Constructors, Inc. v. Loudon County Bd. of Educ.***, 58 S.W.3d 706, 710 (Tenn. 2001) (citations omitted).

---

[2]Wife also asks that this case be reassigned to another jurist on remand. However, she cites no authority for this proposition. We respectfully decline this request.

ANALYSIS

## Dissipation

We first address Wife's argument that the trial court erred in concluding that Husband did not engage in dissipation of marital assets. The factors for a court to consider when equitably dividing the marital estate include "[t]he contribution of each party to the acquisition, preservation, appreciation, depreciation or *dissipation* of the marital or separate property." T.C.A. § 36-4-121(c)(5) (2005) (emphasis added). The term "dissipation" is not defined in the statute. Black's Law Dictionary defines it as "[t]he use of an asset for an illegal or inequitable purpose, such as a spouse's use of community property for personal benefit when a divorce is imminent." BLACK'S LAW DICTIONARY 486 (7th ed. 1999). The *Ward* case outlined the appropriate analysis for allegations of dissipation:

> Trial courts must distinguish between what marital expenditures are wasteful and self-serving and those which may be ill-advised but not so far removed from "normal" expenditures occurring previously within the marital relationship to render them destructive.
>
> In determining whether dissipation occurred, we find trial courts should consider the following: (1) whether the evidence presented at trial supports the alleged purpose of the various expenditures, and if so, (2) whether the alleged purpose equates to dissipation under the circumstances. The first prong is an objective test. To satisfy this test, the dissipating spouse can bring forward evidence, such as receipts, vouchers, claims, or other similar evidence that independently support the purpose as alleged. The second prong requires the court to make an equitable determination based upon a number of factors. Those factors include: (1) the typicality of the expenditure to this marriage; (2) the benefactor of the expenditure, namely, whether it primarily benefitted the marriage or primarily benefitted the sole dissipating spouse; (3) the proximity of the expenditure to the breakdown of the marital relationship; (4) the amount of the expenditure.

*Ward*, 2002 WL 31845229, at *3 (internal citations omitted). A spouse who seeks to prove dissipation must do so by a preponderance of the evidence. *See Robinson v. Robinson*, No. W2003-01836-COA-R3-CV, 2005 WL 1105188, at *16 (Tenn. Ct. App. May 9, 2005). Earlier decisions by this Court discuss the allocation of the burden of proof where dissipation is alleged:

> The burden of persuasion and the initial burden of production in showing dissipation is on the party making the allegation, and that party retains throughout the burden of persuading the court that funds have been dissipated, but after that party establishes a prima facie case that moneys have been dissipated, the burden shifts to the party who spent the money to produce evidence sufficient to show that the expenditures were appropriate.

*Wiltse v. Wiltse*, No. W2002-03132-COA-R3-CV, 2004 WL 1908803, at *4–5 (Tenn. Ct. App. Aug. 24, 2004) (citing 24 AM. JUR. 2D *Divorce and Separation* § 560 (1998)).

In this case, Wife argues that Husband dissipated approximately $218,000 in marital assets by spending money on himself and his paramour Houston Anderson ("Ms. Anderson"). The record includes evidence that Husband paid for the couple's meals at restaurants, paid for vacations with Ms. Anderson, and bought gifts for her. Husband admitted that he spent some monies on Ms. Anderson, but denied that he dissipated the $218,000 that Wife alleges. Husband testified at trial that he spend approximately $25,000 on Ms. Anderson.

In the first appeal, the issue of dissipation was remanded to the trial court for reconsideration because it appeared from the final order of divorce that the trial court had refused to consider the issue of dissipation. In its original order, the trial court concluded that

> [a]ny marital funds which [Husband] may have expended for or on behalf of his paramour, Ms. Houston Anderson, will not be considered by this court as having any bearing on the property distribution, because during the same period, [Wife] received from [Husband] funds, greatly in excess of said expenditure, which she used for her own benefit without accounting to [Husband] for same.

On remand, the trial court clarified its earlier conclusion on the alleged dissipation, and engaged in a detailed *Ward* analysis of Husband's expenditures. Little weight was given to evidence submitted by Wife in the form of the Rule 1006[3] summaries of Husband's expenditures. Indeed, Wife acknowledged that her summaries included inaccuracies and that some seventy-five percent of the alleged dissipation expenditures were listed as "miscellaneous" because Wife did not know what was purchased or paid for by the expenditures. Therefore, the trial court concluded that Wife had failed to satisfy the first prong of the *Ward* analysis, that is, failed to present evidence to support the alleged purpose of the expenditures, and consequently that the burden never shifted to Husband to show the appropriateness of the expenditures. *See Ward*, 2002 WL 31845229, at *3.

After reaching this conclusion, the trial court went on to conclude that, even if Wife had satisfied the first prong of the *Ward* analysis, the expenditures at issue did not constitute dissipation under the second prong of the *Ward* analysis. The trial court considered all four of the factors enumerated in the second prong of the *Ward* analysis. *See id.* The trial court first addressed the "typicality" factor, that is, whether the expenditure was typical to the parties' marriage. *See id.* After noting that Husband had admitted to spending approximately $25,000 on Ms. Anderson, the trial court observed that Husband had spent money on similar travel and meals prior to the separation and that many of the expenditures were for a combination of personal and business purposes. In light of this, the trial court concluded that the expenditures were discretionary spending that was typical of the parties' marriage.

The trial court then addressed the "benefactor" factor, looking at whether the expenditure primarily benefitted the marriage or the alleged dissipating spouse. *See id.* The trial court determined that Wife indirectly benefitted from Husband's expenditures because much of them were for a combination of personal and business purposes, thus enabling Husband to provide Wife temporary support while the parties were separated.

---

[3]Tenn. R. Evid. 1006.

The trial court next looked at the proximity of the expenditure to the breakdown of the marital relationship. *See id.* The trial court found that the majority of the expenditures occurred after the marriage was irretrievably broken, concluding that this *Ward* factor also weighed against finding dissipation.

Finally, the trial court discussed the "amount" of the expenditures at issue. *See id.* The trial court reiterated that it gave little weight to Wife's evidence of dissipation and observed that the $25,000 that Husband testified he spent on Ms. Anderson was small in relation to the pattern of spending in this marriage. After reviewing all of the *Ward* factors, the trial court concluded that Husband's expenditures did not constitute dissipation.

Wife challenges the trial court's findings on remand relative to the dissipation issue. She argues that Husband's expenditures were not typical, that she did not benefit from the expenditures, that the expenditures occurred at times when the couple was having marital trouble, and that the dissipation was substantial, amounting to approximately $218,000.

In finding that Husband did not engage in dissipation of marital assets, the trial court applied the standard set forth in *Ward* in accordance with our previous decision. *See Watson*, 2005 WL 1882413, at *13. The trial court apparently credited Husband's testimony on this issue and gave little weight to Wife's Rule 1006 summaries. Explicitly applying the *Ward* factors, the trial court determined that Husband's expenditures were discretionary spending, not dissipation. After carefully reviewing the record on appeal, and giving appropriate deference to the trial court's determinations on the parties' credibility, we find that the evidence supports "the trial court's fact and credibility driven decision on the dissipation issue." *Lane v. Lane*, No. M2000-01135-COA-R3-CV, 2001 WL 1523365, at *3 (Tenn. Ct. App. Nov. 30, 2001) (citation omitted). This conclusion is based on the trial court's application of the *Ward* factors, not the fact that Husband provided support to Wife in excess of the amounts allegedly dissipated. *See Watson*, 2005 WL 1882413, at *13. On this basis, we affirm the trial court's finding that Husband's expenditures did not constitute dissipation.

### Stock

Husband argues on appeal that the trial court erred in awarding Wife an additional $13,000 for her interest in the Vining Sparks IBG stock. Husband notes that if Wife were to receive any shares of the Vining Sparks IBG stock, she would be required to sell them back to Mr. Vining and Mr. Sparks under the terms of the partnership agreement; in this case, tax liabilities would result, making the trial court's original award of $38,500 to Wife, reflecting the tax consequences, proper. In this case, however, the trial court did not order that the stock be transferred to Wife. Rather, the trial court awarded Husband the ten units of stock and awarded Wife half of the net value of the stock. Because Husband testified that he did not intend to sell the stock and the trial court did not order that it be sold, we affirm the trial court's decision on this issue. *See id.* at *9–10.

### Randell Corporation

-7-

We next address whether the trial court erred in confirming its prior determination that Randell Corporation is unable to pay the debt it owes to Husband, and that the value of the Randell Corporation is zero. The trial court's valuation of a marital asset is a question of fact and is entitled to a presumption of correctness. *Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997) (citation omitted).

In the first appeal, we noted that

[t]he amount of this loan at the time of trial was $419,481.23, and the special master's testimony and report states that, if the court should adopt the -$119,111.00 [valuation] for the Randell Corporation, it must also recognize a corresponding receivable asset to Husband in this amount. If the trial court did not recognize the loan as a receivable asset for Husband, the special master stated that the loan should not be recognized as a corporate liability in calculating the value of the Randell Corporation.

*Watson*, 2005 WL 1882413, at *9. On remand, the trial court found:

4.     The evidence established that Receivable [the corporation's debt to Husband] could not be paid by Randell to [H]usband even with the liquidation of all of Randell's assets including the land that is Randell's main asset.
5.     [Husband] and the Special Master testified that the cost of liquidation . . . would exceed $300,000. . . . Thus upon liquidation, Randell would have a negative value in excess of $419,000 and thus could not pay the Receivable.

* * *

7.     Based upon the evidence before the Court, it was determined that, taking into account the negative $119,111.00 value of Randell, no funds would remain to pay the Receivable after deduction of the costs of selling Randell's assets and, thus, the value to the marital estate of the Receivable was zero.
8.     Based on this Court's review of the undisputed testimony, this Court . . . reconfirms its prior determination that the value of Randell is zero and Randell is unable to pay any money to [Husband].

Thus, the trial court found that, in order to pay its debt to Husband, Randell would have to liquidate its assets. However, if Randell liquidated its assets, the costs would consume the proceeds of liquidation. This left Randell unable to pay the debt to Husband by liquidation or otherwise. From this, the trial court determined that (a) Husband's receivable from Randell was worthless, and (b) the value of Randell Corporation was zero.

Based on the undisputed testimony from both Husband and the Special Master regarding the cost of liquidating Randell's assets, the preponderance of the evidence supports the trial court's

finding that Randell is unable to pay its debt to Husband. Thus, the trial court's conclusion that "the value to the marital estate of the Receivable was zero" is well-founded.

However, the trial court found at the same time that "the value of Randell is zero." Therein lies the problem. At trial, Special Master Lynn Evans testified that Randell's debt to Husband had to be treated the same way on Husband's personal balance sheet and Randell Corporation's balance sheet:

> The appropriate manner to handle [Randell Corporation's debt to Husband] would be to treat it the same way for both sets of books. If it's set up as a liability in the corporation, then it would be appropriate for it to be on the personal. If it's left off the personal, it should also be left off the corporation.

Here, the trial court properly found that Randell was simply unable to pay its debt to Husband. This in effect removed the receivable from Husband's list of assets. To be consistent, if Randell is not expected to pay its debt to Husband, then, as we stated in the prior appeal in this case, "the loan should not be recognized as a corporate liability in calculating the value of the Randell Corporation." *See id.*

Had Randell corporation been required to pay Husband the $419,000 debt it owed to him, the Special Master found that Randell's value would be a negative $119,000. If Randell will not be required to pay the debt, the $419,000 amount of the liability must be added back into the value of the corporation, giving Randell a positive asset valuation of some $300,000.[4] Thus, while Husband's receivable from Randell Corporation may be worthless, Randell Corporation itself is not, and would be considered an asset, awarded to Husband in the property division, with a value of approximately $300,000.

In light of these findings, we now consider Wife's argument on appeal that the trial court erred in its distribution of the marital property. The division of marital property in divorce cases is governed by Tennessee Code Annotated § 36-4-121, which generally provides that the trial court is to divide the property equitably without regard to fault.[5] The trial court has substantial discretion

---

[4]The appellate record does not include evidence of the tax consequences to Randell Corporation of having its $419,000 debt to Husband in effect "forgiven."

[5] Tennessee Code Annotated § 36-4-121(a)(1) reads in pertinent part as follows:

> In all actions for divorce or legal separation, the court having jurisdiction thereof may, upon request of either party, and prior to any determination as to whether it is appropriate to order the support and maintenance of one (1) party by the other, equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just.

T.C.A. § 36-4-121(a)(1) (2005).

when dividing the marital property, and its distribution will be given "great weight" on appeal.[6] ***See Sullivan v. Sullivan***, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002) (citing ***Goodman v. Goodman***, 8 S.W.3d 289, 298 (Tenn. Ct. App. 1999)).  An appellate court is "disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results from some error of law or misapplication of statutory requirements and procedures." ***Martin v. Martin***, 155 S.W.3d 126, 129 (Tenn. Ct. App. 2004) (quoting ***Herrera v. Herrera***, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)).  The division of the marital estate is not required to be equal in order to be equitable.  ***See Kinard v. Kinard***, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998) (citations omitted).

Under the terms of the trial court's order, Wife was awarded all of the equity in the marital residence up to $120,000.  She received almost all of the household goods and furnishings in the marital residence, valued at approximately $100,000.[7]  Wife received half of the net cash surrender value of the insurance policies on Husband's life (approximately $20,850), half of the value of Husband's 401(k) retirement account with the Baker Donelson law firm (approximately $49,000) and $51,500 for her net interest in the Vining Sparks IBG stock.  She also received all bank and investment accounts in her name (approximately $2,075) and all insurance policies on her life (approximately $10,000).  She also received her vehicle, valued at $500.[8]  In all, the value of Wife's

---

[6]In equitably dividing the marital estate, the trial court is to consider "all relevant factors," including the following:

(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
(4) The relative ability of each party for future acquisitions of capital assets and income;
(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
(6) The value of the separate property of each party;
(7) The estate of each party at the time of the marriage;
(8) The economic circumstances of each party at the time the division of property is to become effective;
(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
(10) The amount of social security benefits available to each spouse; and
(11) Such other factors as are necessary to consider the equities between the parties.

T.C.A. § 36-4-121(c) (2005).

[7]Husband received an original Farnsworth painting valued at approximately $10,000.

[8]This is the net value of the vehicle, considering the remaining debt on the automobile loan.

share of the marital property totaled approximately \$343,925.[9]  As to liabilities, Wife was ordered to pay all outstanding debt in her own name, which totaled approximately \$21,130 and the parties' approximately \$15,000 debt to Wife's mother, Margaret Vick.  After considering the debt allocated to Wife, her net share of the marital estate totaled approximately \$307,795.

The trial court awarded Husband the household goods and furnishings in his apartment, valued at approximately \$40,000, plus a painting valued at approximately \$10,000.  He also received all rights, title, and interest in the Randell Corporation deemed to have zero value.  Husband received all of the Vining Sparks IBG stock, subject to Wife's \$51,500 lien, representing half of the net value of the stock.  Husband received all of his stock in Baker Donelson, valued at approximately \$22,000, his entire 401(k) retirement account with Baker Donelson, subject to Wife's \$49,000 lien (representing half of the value of the 401(k) account), and all of the insurance policies on his life, subject to Wife's \$20,850 lien, representing half of the net cash surrender value.  Husband received the vehicles driven by him and by his son, valued at a total of approximately \$2,000,[10] and all of his guns and sporting equipment, valued at approximately \$11,165.  Husband also received all bank and investment accounts in his name, valued at approximately \$2,272.  In all, Husband's share of the marital property totaled approximately \$208,787.  Husband was ordered to pay all outstanding debts in his name, including credit card debt, which totaled approximately \$62,589, as well as two business-related loans totaling \$286,000.  Husband was also ordered to pay the special master's fee of \$7,185.  Husband's affidavit indicates that he was responsible for 2003 income taxes in the amount of \$40,000.  This amounted to a total debt of approximately \$395,774.[11]  Using the trial court's valuation of Randell Corporation, Husband's net allocation of marital property would be a negative \$186,987.

However, as noted above, we have determined that, in light of the fact that Randell's \$419,000 indebtedness to Husband must be considered, in essence, forgiven, Randell Corporation would have a positive valuation.  In light of the trial court's division of the remainder of the marital property, we find that the net value of Randell Corporation should be divided between the parties, half to Wife and half to Husband.  However, the record does not include evidence on the tax consequences or other ramifications, to both Husband and Randell, of deeming Randell's indebtedness to Husband uncollectible.[12]  So we must remand this issue to the trial court.  With this modification, the trial court's distribution of the marital property is affirmed as modified.

---

[9] The \$20,850 award of half of the net cash surrender values of the insurance policies on Husband's life was alimony *in solido*.

[10] Again, this represents the net value, considering any outstanding automobile loans.

[11] The distribution of the marital debt included other loans not listed separately because they were considered in arriving at a net value of other assets.  They include a \$307,000 loan from First Tennessee Bank secured by the Vining Sparks IBG stock, a \$710,000 loan to Randell that Husband guaranteed, and various other smaller loans, including automobile loans.

[12] As with the tax consequences of selling the Vining Sparks stock, the trial court should consider on remand whether Randell Corporation's debt to Husband will in fact not be paid (forgiven from the standpoint of Randell, written off from Husband's standpoint), and any resulting tax consequences or other ramifications for Randell and Husband.

**Alimony**

We now address Wife's assertion that the trial court erred in not awarding her alimony *in futuro*. In her complaint for divorce, Wife sought "alimony," without specifying a type or amount. At trial, Wife asked for transitional alimony for twelve years. The trial court awarded Wife transitional alimony for a total of six years, $6,000 a month for three years and $3,000 a month for the next three years. In the first appeal, Wife sought transitional alimony for ten years. The issue of alimony was not addressed in this Court's opinion in the first appeal because issues affecting the property distribution were remanded to the trial court, with issues surrounding alimony to be reconsidered in the context of the altered division of marital property.

On remand to the trial court, Wife sought alimony *in futuro*. The trial court did not award Wife alimony *in futuro*, but instead awarded an additional year of transitional alimony. Wife now asks this Court to award her alimony *in futuro* in the amount of $6,000 per month.

Husband argues that Wife is judicially estopped from seeking alimony *in futuro*, because at trial she asked for transitional alimony. "Pursuant to the doctrine of judicial estoppel, a party will not be permitted to take a position that is directly contrary to or inconsistent with a position previously taken by the party where the party had or was chargeable with full knowledge of the facts and where the conduct would prejudice another." *Guzman v. Alvares*, 205 S.W.3d 375, 382 (Tenn. 2006) (citing *Marcus v. Marcus*, 993 S.W.2d 596, 602 (Tenn. 1999)).

Husband also argues that Wife has waived the issue of alimony *in futuro* because she failed to raise this issue at trial or in the first appeal. The appellate court may treat issues that are not raised on appeal as being waived. *See* Tenn. R. App. P. 13(b); *Bing v. Baptist Mem'l Hosp.-Union City*, 937 S.W.2d 922, 924 (Tenn. Ct. App. 1996). Issues that are not raised in the trial court may also be deemed waived. *See* Tenn. R. App. P. 36(a); *Alexander v. Armentrout*, 24 S.W.3d 267, 272 (Tenn. 2000).

Husband points to no place in the record in which he argued to the trial court that Wife was judicially estopped from seeking alimony *in futuro* or that Wife had waived the issue of alimony *in futuro*, and we have found none. Under these circumstances, we must find that Husband has waived the issues of judicial estoppel and waiver as to Wife's request for alimony *in futuro*. *See* Tenn. R. App. P. 36(a).

Having determined that the issue is properly before this Court, we now address Wife's argument that the trial court erred in declining to award her alimony *in futuro*. "Trial courts have broad discretion to determine whether spousal support is needed and, if so, the appropriate type of alimony, amount, and duration." *Neamtu v. Neamtu*, No. M2008-00160-COA-R3-CV, 2009 WL 152540, at *5 (Tenn. Ct. App. Jan. 21, 2009) (citing *Wynns v. Wynns*, No. M2007-00740-COA-R3-CV, 2008 WL 4415786, at *2 (Tenn. Ct. App. Sept. 26, 2008)). Appellate courts are, therefore, reluctant to second guess a trial court's decision regarding alimony "unless it is not supported by the evidence or is contrary to the public policy embodied in the applicable statutes." *Brown v. Brown*, 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994) (citations omitted).

Tennessee Code Annotated § 36-5-121(i) outlines the factors to be considered in determining whether to award alimony and, if so, the type and amount.[13] The two most important factors are the need of the disadvantaged spouse and the obligor spouse's ability to pay. *Avaritt v. Avaritt*, No. M2007-01804-COA-R3-CV, 2008 WL 4072087, at *2 (Tenn. Ct. App. Aug. 28, 2008) (citing *Oakes v. Oakes*, 235 S.W.3d 152, 160 (Tenn. Ct. App.2007)). Although fault is an appropriate factor to consider, alimony is not meant to be punitive. *See* T.C.A. § 36-5-121(i)(11) (2005); *Tait v. Tait*, 207 S.W.3d 270, 278 (Tenn. Ct. App. 2006) (citations omitted).

Here, Husband, age sixty-three at the time of trial, is a shareholder with the Baker Donelson law firm, with earnings from the firm for the years 2001-2003 of approximately $296,000, $287,000, and $303,000, respectively. At trial, Husband's February 2004 affidavit stated that his most recent draw from Baker Donelson at that time was approximately $13,000 per month, with a potential year end distribution of up to $54,000. The average monthly distribution from the Vining Sparks IBG stock awarded to Husband varied from zero to $4,750. The trial court found that Husband was in good health and that his total overall income "averages between $350,000-$400,000 in yearly gross income from his law firm, commodities trading company and the Vining Sparks IBG Securities Company."

In contrast, Wife last worked full time over twenty years ago as a securities and commodities trader earning over seventy-five percent of her commissions from trades that she made on behalf of Husband or Randell. Her securities and commodities trading licenses have long since lapsed. Wife quit her job as a securities and commodities broker to stay home and care for the parties' learning

---

[13]Those factors include:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

T.C.A. § 36-5-121(i) (2005).

disabled son. This permitted Husband to focus on furthering his career. This family choice is explicitly supported by the legislature. The alimony statute provides as follows:

> Spouses have traditionally strengthened the family unit through private arrangements whereby one (1) spouse focuses on nurturing the personal side of the marriage, including the care and nurturing of the children, while the other spouse focuses primarily on building the economic strength of the family unit. This arrangement often results in economic detriment to the spouse who subordinated such spouse's own personal career for the benefit of the marriage. It is the public policy of this state to encourage and support marriage, and to encourage family arrangements that provide for the rearing of healthy and productive children who will become healthy and productive citizens of our state.

T.C.A. § 36-5-121(c)(1) (2005).

Here, the trial court ordered an award of transitional alimony. Codified in 2003, transitional alimony is a sum certain paid "for a determinate period of time." T.C.A. § 36-5-121(g)(1) (2005). It is "awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce." *Id.*; *see also* T.C.A. § 36-5-121(d)(4) (2005). An award of transitional alimony is generally non-modifiable. *See* T.C.A. § 36-5-121(g)(2) (2005).

In contrast, alimony *in futuro* is paid on a long term basis, generally "until death or remarriage of the recipient." T.C.A. § 36-5-121(f)(1) (2005). It is also paid to an economically disadvantaged spouse when rehabilitation "is not feasible," defined in the statute as "meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse." *Id.* An award of alimony *in futuro* is subject to modification "upon a showing of substantial and material change in circumstances." T.C.A. § 36-5-121(f)(2)(A) (2005).

In the divorce decree, the trial court found that Wife, fifty-six years old at the time of trial, was in good health, was a high school graduate "with previous training in marketing and/or securities trading activities." It noted that she had been a homemaker since 1985, when she ceased working outside the home to care for the parties' son. The trial court made no findings regarding Wife's potential for rehabilitation or her earning capacity.

In her testimony, Wife indicated that she believed that she could pass the required tests to renew her licenses in securities and commodities trading, but was hampered because an employer sponsor was necessary for her to take the tests, and she had had no success in finding one. From the testimony it appears that Wife is able to work in some capacity, though it is unclear whether the work would be in securities and/or commodities trading. It is clear that whatever work Wife is able to secure, she will never approach a level of earnings remotely comparable to Husband.

The alimony statutes define rehabilitation as attaining an earning capacity that permits the economically disadvantaged spouse a standard of living that is "reasonably comparable to the standard of living enjoyed during the marriage." T.C.A. § 36-5-121(f)(1) (2005). It is clear that the standard is not attainable by Wife, and indeed is probably not attainable by Husband. While Husband is a respected lawyer and businessman with impressive earnings, the parties' lifestyle during the marriage simply did not reflect the truth of their financial circumstances. The proof indicates that the assets owned by Husband were supported by cash flow, but were leveraged by a crippling amount of debt, creating a facade of affluence. It appears from the record that neither party will be able to maintain a standard of living after the divorce that is "reasonably comparable to the standard of living enjoyed during the marriage."

The alternate statutory definition of rehabilitation means that the economically disadvantaged spouse attains an earning capacity that permits a standard of living that is "reasonably comparable . . . to the post-divorce standard of living expected to be available to the other spouse." *Id.* From the record, it is unclear what Husband's post-divorce standard of living will be. Much of the proof on Husband's alleged dissipation focused on Husband's expenditures that involved his extra-martial relationship, such as travel, housing and clothing expenses, restaurants and entertainment. While such expenditures would appear extravagant in the face of the enormous debt load that Husband was carrying during this time, the trial court found that this spending pattern was simply a continuation of the spending in which Husband had engaged throughout the marriage, *i.e.*, was "typical" to the parties' marriage. The record bears out this finding.

In the context of considering alimony, we then consider Husband's "post-divorce" standard of living and whether Wife will be able to attain a standard of living that is reasonably comparable, given the allocation of the marital estate to her and her expected level of earnings. In reviewing Husband's expenditures during the parties' separation, the trial court commented that "Husband could not have maintained his professional lifestyle at the same level without these expenditures," even going so far as to find that the expenditures benefitted Wife. It is unclear whether the trial court was indicating that Husband should be expected to continue to maintain such an expensive lifestyle, even in the face of mountainous debt which, at the end of the day, must be paid.

This issue also impacts our evaluation of Husband's ability to pay alimony *in futuro* to Wife, one of the two most important factors. Counsel for Husband rightly emphasizes the amount of indebtedness that was allocated to Husband in the trial court's division of marital property. The debt is daunting indeed, but the trial court could only have allocated it to Husband; he chose to incur it and is the only party with any hope of repaying it. On top of paying off the debt, is Husband expected to retain the facade of affluence in the name of maintaining a "professional" lifestyle? Meanwhile Wife, having been out of the workforce for over twenty years to raise the parties' son, finds herself ill-equipped for any work other than an entry-level job.

The trial court specifically found that Wife needs support and that Husband is able to pay, and the record supports those findings. We note that Wife received the lion's share of the marital property. However, after purchasing necessities such as a new home, her remaining marital property will be insufficient to sustain her once the transitional alimony runs out, and, like Husband, Wife

-15-

must make provisions for her eventual retirement.  Therefore, from the record, we find that Wife will have a continued need of support beyond the transitional alimony awarded by the trial court.

Based on the application of the factors enumerated in Section 36-5-121(i) to the facts of this case, we must conclude that Wife is entitled to an award of alimony *in futuro* upon termination of the transitional alimony.  Therefore, we modify the trial court's alimony award to include an award of alimony *in futuro* in the amount of $1,500 per month upon termination of the transitional alimony award.[14]

### Attorney's Fees

We next address whether the trial court erred in refusing to award Wife her attorney's fees.  A trial court's decision regarding an award of attorney's fees is reviewed under an abuse of discretion standard, and will only be reversed if the trial court abused its discretion.  *Owens v. Owens*, 241 S.W.3d 478, 496 (Tenn. Ct. App. 2007) (citing *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995); *Eldridge v. Eldridge*, 137 S.W.3d 1, 25 (Tenn. Ct. App. 2002)).  A trial court abuses its discretion when "its decision is not supported by the evidence, when it applies an incorrect legal standard, [or] when it reaches a decision which is against logic or reasoning that causes an injustice to the party complaining."  *Id.* (citing *Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005)).

An award of attorney's fees usually takes the form of an award of alimony *in solido*.  *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002) (citing *Storey v. Storey*, 835 S.W.2d 593 (Tenn. Ct. App. 1992)).  "Accordingly, a trial court considering a request for attorney's fees must consider the factors contained in [Tennessee Code Annotated] § 36-5-121(i), with the most important factors being the need of the economically disadvantaged spouse and the ability of the obligor spouse to pay."  *Owens*, 241 S.W.3d at 495–96 (citing *Eldridge*, 137 S.W.3d at 24–25; *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001)).  "It is considered most appropriate where the final decree of divorce does not provide the obligee spouse with a source of funds, such as from property division or alimony in solido, with which to pay his or her attorney."  *Yount*, 91 S.W.3d at 783 (citing *Houghland v. Houghland*, 844 S.W.2d 619 (Tenn. Ct. App.1992)).

Wife argues that Husband should be ordered to pay her attorney's fees because he paid some of his own attorney's fees from the assets of Randell Corporation, a marital asset.  For this proposition, Wife cites *Aaron v. Aaron*, 909 S.W.2d 408 (Tenn. 1995) and *Hanover v. Hanover*, 775 S.W.2d 612 (Tenn. Ct. App. 1989).  Indeed, this is a factor for the trial court to consider in determining whether to award a party attorney's fees.  *See* T.C.A. § 36-5-121(i)(12) (2005).

However, we also consider the share of marital property awarded to each party.  In this case, Wife received a generous share of the marital property.  Her net allocation prior to any division of the value of Randell Corporation totals over $300,000.  Moreover, upon termination of Wife's

---

[14]In his brief, Husband argues persuasively that transitional alimony under Tennessee Code Annotated §§ 36-5-121(d)(4) and 36-5-121(g)(1) was intended to be of a duration of two years or less, citing the legislative history on H.B. 1480 and S.B. 622 in 2003.  As noted by Husband, the fact that transitional alimony is generally non-modifiable supports the premise that it was intended to be short-term.  However, in light of our award of alimony *in futuro* at the end of the trial court's award of transitional alimony in this case, we need not address Husband's argument.

transitional alimony, she will receive alimony *in futuro* in the amount of $1,500 per month. Based on a consideration of the statutory factors, we find no error in the trial court's refusal to order Husband to pay Wife's attorney's fees.

### Post-Judgment Interest

Finally, we address whether the trial court erred in failing to award post-judgment interest on the additional $13,000 awarded to Wife as a result of the modified valuation of the Vining Sparks IBG stock. The statute provides that "[i]nterest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial." T.C.A. § 47-14-122 (2001). The award of post-judgment interest is mandatory and the trial court may not refuse to make such an award. *Vooys v. Turner*, 49 S.W.3d 318, 322 (Tenn. Ct. App. 2001) (citations omitted).

Wife argues that interest begins to accrue from the date that the party is entitled to the money, *see Williams v. Williams*, No. E1999-02750-COA-R3-CV, 2000 WL 816821 (Tenn. Ct. App. June 23, 2000), and that Wife was entitled to the additional $13,000 at the time of the entry of the final divorce decree on March 17, 2004. Husband, however, cites the case of *Bunch v. Bunch*, No. 03A01-9805-GS-00156, 1999 WL 172674 (Tenn. Ct. App. Mar. 24, 1999), and argues that the interest did not begin to accrue until the entry of the judgment on remand, which occurred on November 6, 2007.

In *Bunch*, this Court addressed a situation similar to that presented in this case. As in the present case, *Bunch* was on appeal for the second time. *Id.* at *1. In the first appeal, this Court determined that the trial court had undervalued one of the marital assets, and remanded the case to the trial court for a redetermination of "the apportionment of marital assets." *Id.* at *4. On remand, the trial court determined that the wife was entitled to an additional award of $12,500. *Id.* at *1. In the second appeal, the wife argued that she was entitled to an award of post-judgment interest from the date of the original divorce decree. *Id.* at *4. In support of her position, she relied on *Wade v. Wade*, 897 S.W.2d 702 (Tenn. Ct. App. 1994); *Inman v. Alexander*, 871 S.W.2d 153 (Tenn. Ct. App. 1993); and *Inman v. Inman*, 840 S.W.2d 927 (Tenn. Ct. App. 1992). In those cases, post-judgment interest was awarded from the date of the original judgment, not the date of the judgment on remand. *See Wade*, 897 S.W.2d at 720; *Inman v. Alexander*, 871 S.W.2d at 153–54; *Inman v. Inman*, 840 S.W.2d at 931.

The *Bunch* Court, however, distinguished the cases on which the wife relied. It noted that, in those cases, "the appellate court *modified* the lower court's judgment, *i.e.*, changed specific monetary awards therein." *Bunch*, 1999 WL 172674, at *4. In *Bunch*, however, after determining that one of the marital assets was undervalued, the appellate court had remanded the case to allow the trial court to determine the proper distribution. *Id.* Therefore, the *Bunch* Court held that "the date on which the trial court entered judgment after reapportioning the parties' marital assets upon remand . . . is the date upon which it 'returned the verdict' for purposes of [Tennessee Code Annotated] § 47-14-122." *Id.* at *5. Accordingly, the appellate court held that the wife was entitled to interest from the date of the judgment on remand, not the date of the original judgment. *Id.*

In the present case, as in ***Bunch***, this Court did not modify the judgment of the trial court. Rather, it remanded the case to the trial court for a reconsideration of the distribution of the marital estate after determining that one of the marital assets was undervalued. ***See Watson***, 2005 WL 1882413, at *10. Because this Court remanded the case to allow the trial court to make its own decision regarding the distribution, the date of the judgment on remand, not the date of the original divorce decree, is the date on which the trial court "returned the verdict" for the purposes of Section 47-14-122. ***See Bunch***, 1999 WL 172674, at *5. Therefore, post-judgment interest on the additional $13,000 awarded to Wife as her share of the marital estate began to accrue from November 6, 2007, which was the date of the judgment on remand. On remand, the trial court is directed to award post-judgment interest on the additional $13,000 from November 6, 2007, the date of the judgment on the previous remand.

## CONCLUSION

For the reasons stated above, we affirm the trial court's finding that Husband did not dissipate marital assets, affirm the trial court's award of an additional $13,000 to Wife for her interest in the Vining Sparks IBG stock, reverse the trial court's finding that the value of Randell Corporation is zero and remand the cause for allocation between the parties of the net value of Randell, modify the trial court's alimony award to include, upon expiration of the transitional alimony, an award of alimony *in futuro* in the amount of $1,500 per month, affirm the trial court's refusal to award Wife her attorney's fees, and order the award of post-judgment interest on Wife's award on the modified valuation of the Vining Sparks IBG stock from the date of the judgment on remand on November 6, 2007.

The decision of the trial court is affirmed in part, reversed in part, modified, and remanded as set forth above. The costs of this appeal are taxed equally to Carol Ann Vick Watson, and her surety, and Frank Lee Watson, Jr., for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE

-18-