# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
May 23, 2012 Session

## DAMON GORBET v. TIFFANY GORBET

**An Appeal from the Chancery Court for Madison County**
**No. 67639      James F. Butler, Chancellor**

---

**No. W2011-01879-COA-R3-CV - Filed October 11, 2012**

---

This is a divorce case. Prior to the parties' marriage, the wife lived in Arkansas and the husband lived in Tennessee. When the parties married, the wife quit her job in Arkansas and the parties moved into a house in Tennessee. They separated after just seven months of marriage, and the husband filed this complaint for divorce. After a two-day trial, the trial court declared the parties divorced and equitably divided the parties' marital property. The trial court awarded the wife transitional alimony, attorney fees as alimony *in solido*, and moving expenses for the wife to return to Arkansas. The husband now appeals. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

David W. Camp, Jackson, Tennessee, for the Petitioner/Appellant Damon Gorbet

Edward M. Bearman, Memphis, Tennessee, for the Respondent/Appellee Tiffany Gorbet

## OPINION

Before the parties to this appeal met, Defendant/Appellee Tiffany Gorbet ("Wife") lived in a home in Bauxite, Arkansas, with her twelve-year-old daughter from a previous marriage. She was employed at Baptist Health Medical Center in nearby Little Rock, Arkansas, as a quality management analyst. Plaintiff/Appellant Damon Gorbet ("Husband") owned a construction company, Gorbet Construction, LLC ("Gorbet Construction"), in Jackson, Tennessee. He lived in an apartment in Jackson and operated his business out of his home.

In 2009, Husband and Wife met through an online dating service and embarked on a long-distance relationship. They became engaged in December 2009. To start their new life together, they jointly decided that, after the wedding, Wife would quit her job and move to Jackson with her daughter to live with Husband.

Before the wedding, Husband and Wife together selected a home in Jackson, located on Willow Green Drive, to be the home for all of them after the parties married. On June 25, 2010, a few weeks before the wedding, Husband closed on the Willow Green home. Wife was not present at the closing. The only name on the deed to the home was Husband's name; Wife's name was never added to the deed.

On July 17, 2010, the parties married in Jackson. Wife and her daughter moved into the home on Willow Green with Husband. Wife placed her Arkansas home for sale, but the marriage crumbled before it sold.

The parties' relationship began disintegrating almost immediately after Wife and her daughter moved to Jackson. On February 22, 2011, after only seven months of marriage, Husband moved out of the home on Willow Green.

Shortly after that, the parties hired lawyers and the litigation began. On March 1, 2011, Husband filed a complaint for divorce, accompanied by a petition for an order requiring Wife to vacate the marital home. On March 18, 2011, Wife countered with a motion for exclusive use of the Willow Green home. Wife also filed a motion for alimony *pendente lite* and health insurance coverage.

Later the same month, the trial court held a hearing on the parties' motions. At the conclusion of the hearing, the trial court entered an order denying Husband's petition to require Wife to vacate the home on Willow Green, granting Wife's petition for exclusive use of the home, and awarding Wife $2,055 per month in temporary alimony. The trial court also ordered Husband to continue "to pay all expenses associated with the marital home including, but not limited to, the house payment, utilities, [Wife's] cell phone bill, and any yard care expense associated with the upkeep of said home."[1] Discovery ensued.

On July 15 and 18, 2011, the trial court conducted a trial in this matter. The evidence consisted primarily of the testimony of Husband and Wife. They gave differing perspectives on the volatile, short-lived marriage.

---

[1]The next month, Husband filed another motion for exclusive use of the marital home or, alternatively, for exclusive use of Wife's home in Arkansas. The trial court denied that motion.

Husband testified that, when he and Wife decided to get married, it was understood that Wife and her daughter would relocate to Jackson to live with him. Husband voluntarily paid tuition of about $7,500 for Wife's daughter to attend school in Jackson. Husband has a daughter from a previous marriage, then about ten years old, with whom he had residential parenting time every other weekend.

Husband said that the parties' arguments started in the first month of their marriage. He described Wife as erratic, explosive, verbally abusive, and at times physically violent. He testified that Wife's yelling and screaming so upset his daughter that several times he called his previous wife to take the child back home before the end of his scheduled parenting time. Husband recounted several of Wife's outbursts. On one occasion, he said, the administrators at his daughter's school had to ask Wife to leave. Another occurred at their home on Willow Green with Wife's daughter present, in which Husband locked himself in a bedroom to get away from Wife, and she responded by kicking a hole in the door and breaking the door frame. On another occasion, Wife trashed Husband's home office by slinging drawings, files, and other items onto the floor. Things got so bad, Husband claimed, that he began to videotape Wife's behavior with his cell phone. Three of these video recordings were introduced into evidence at trial.

Husband also testified about his business, Gorbet Construction. At the time of trial, Husband had been the sole owner of the limited liability company for about nine years. He said that he primarily builds custom homes, "[m]ostly bigger . . . more expensive homes," and at times would purchase lots on a speculative basis, anticipating that a client may become interested in building on the lot.

Husband insisted that Wife was never employed by Gorbet Construction. At most, he said, she helped him when they were first married by signing about twenty checks, and the two of them met several prospective clients during a home show.

Husband described how he operated his business and personal bank accounts. The company's business, he said, was conducted primarily through a checking account at Commercial Bank in the name of Gorbet Construction, LLC.[2] He also maintained a personal checking account at Commercial Bank, but it was treated as a savings account to hold his "extra" money. Husband conceded that, although the LLC account was in the name of the business, he used that account for both business and personal matters. He said that money acquired through his construction projects is deposited into the LLC's Commercial Bank account; he then pays for the costs of construction out of that account, and the remainder is

---

[2]Husband said that he had business accounts at both First Tennessee Bank and The Bank of Jackson, but both were maintained only for business purposes and had not been used in years.

retained in the same account as his profit. Rather than writing himself a paycheck out of the business account and depositing it into a personal account, Husband explained, he just pays his personal expenses out of the same account:

> Q: Okay. And how do you personally get paid?
> A: I withdraw money from the construction company [Commercial Bank account].
> Q: Do you put it into the personal account?
> A: Well, sometimes I do that. But most of the time what happens is – I write checks like I say out of Quick Books and it just shows up as a[n] owner withdrawal from the company.
> . . .
> Q: So as to paying utilities at Willow Green, . . . or paying any expenses that you might incur on a personal nature, the general source of where that's going to come from will come from the LLC account at Commercial Bank?
> A: Yeah. It doesn't make sense to take money and put it in another account and write it again. It just creates another transaction.
> Q: I understand. What do you keep the personal account for then? . . .
> A: Well, they have a – they pay four percent interest if you happen to have any money in it. . . . So if I have any extra money I put that in there.
> Q: So are you treating it more as a savings type account?
> A: Yeah.
> . . .
> Q: So Mr. Gorbet, would this be the way that you've conducted your business during the time that you've been married to Mrs. Gorbet, which was July of last year until now?
> A: Sure. I've always done it that away [sic].
> . . .
> Q: . . . Would those [profits] be used for the purpose of paying living expenses that you and your wife were incurring while you were together?
> A: Sure. Yeah.

The approximately $1,000 per month that Husband receives in child support from his previous wife is deposited into the same LLC account. Husband said that he and Wife never had a bank account in both of their names, so Wife never had access to any of Husband's

income.[3]  When he moved out of the home on Willow Green in February 2011, Husband gave Wife $1,800 for her monthly expenses.

Husband contended that the Willow Green home the parties lived in during their marriage should be classified as his separate property. Husband testified that he purchased the home before the parties married, the title and mortgage were in his name only, and the mortgage payment every month came out of the LLC's Commercial Bank account.  Husband first said that he purchased the home before the parties "even scheduled [their] wedding," but then acknowledged that the closing on the home took place a few weeks before the wedding.  Husband said that he never told Wife that she was an owner of the home.[4]  Husband agreed that the parties' plan when he purchased the home was to share it "as the marital home" and to live in "the home that we got under the same roof as a married couple."  Husband admitted that Wife gave the car that she owned prior to the marriage to workmen in exchange for $2,000 worth of stonework performed on the home.

Husband stated that Wife attempted to steal money from him after he told her that he intended to file for divorce.  First, Wife opened a bank account at Regions Bank under the name "Tiffany Thompson-Gorbet d/b/a Gorbet Construction" without his authorization.  Into that account, she deposited two checks totaling $7,680 made out to Gorbet Construction that she had taken from Husband, and two other checks, totaling $8,716, with unknown origins.  When Husband discovered what Wife had done, he convinced her to return the monies to the rightful owners, and the account was closed.  Husband also claimed that Wife wrote checks out of the LLC's Commercial Bank account, to herself and to creditors, without his authorization.  Ultimately, Commercial Bank reversed these charges.  Wife also tried to add herself as a signator on the LLC's Commercial Bank account; the Bank officers refused to add her without Husband's authorization.  Husband said that Wife's "shenanigans" made the Bank reluctant to loan him money for his business.

Husband claimed that all four of the tracts of real property at issue were his separate property; he conceded that Wife's Arkansas home was her separate property. The four pieces of real estate were the Willow Green home, two homes under construction on Greenhill in Jackson, and an undeveloped lot on San Arbor Cove in Jackson ("the San Arbor property").  Husband said that Gorbet Construction built the Greenhill homes before the parties' marriage

---

[3]Perhaps epitomizing the marriage, upon the advice of a marriage counselor, Husband and Wife opened a joint checking account in both of their names in early 2011.  Only one check was written on the account, and it was closed shortly thereafter.

[4]In his trial testimony, Husband said that Wife was never upset by the fact that she was not on the title to the home.  In his deposition, Husband said that Wife brought up the topic of having her name added to the deed, and that he told her there was no need because they might sell the house in the future.

as speculative homes. When they did not sell, Husband rented them. The San Arbor property was purchased in February 2011, during the marriage, for a similar purpose. The $16,000 down payment on the San Arbor lot came out of the LLC's Commercial Bank account.

Husband claimed that he earns approximately $60,000 to $70,000 per year. He testified that he owned a Hummer vehicle, a Harley motorcycle, and a $162,000 annuity funded by a settlement from his first marriage. Husband estimated his net worth to be about $625,000.

Husband testified that, for ten years prior to the trial, he had procured a term life insurance policy every year with his first wife as the beneficiary, with the understanding that the proceeds would go toward the support of his daughter. During his marriage to Wife, the insurance company offered Husband the opportunity to convert this policy into a whole-life policy, which would give him lifetime guaranteed life insurance and also have a cash value. Husband accepted the offer and paid the insurance company $20,000 out of the LLC's Commercial Bank account to convert the policy. He said that the cash value of the policy was $13,500. He maintained that the whole-life policy was his separate property; it was not procured as a result of his marriage to Wife, and Wife was never intended to be the beneficiary of the policy.

In his testimony, Husband acknowledged infidelity. During the marriage, he said, he had an extramarital affair, and he took his paramour on out-of-town trips and paid for her hotel and meals. He also conceded that he initially denied the affair under oath in discovery, and only admitted it after Wife discovered proof of it. Husband said that, after the parties separated, he had text exchanges and telephone conversations with two former girlfriends.

Wife also testified at trial. She said that the parties agreed that she would move to Jackson after their wedding. She testified that she quit her job in Arkansas and left her home, her church, and her family to marry Husband. Wife claimed that Husband did not want her to work for a third party but, instead, wanted her to help with his construction business. She did, she claimed, by running errands, signing checks, and helping Husband with a week-long home show.

During the parties' marriage, Wife said, she had no access to Husband's bank accounts. She asserted that, prior to the marriage, she had a savings account with about $20,000. She claimed that she "basically lived off that the whole time [she] was . . . in Jackson. " The monies in that account were used, Wife testified, to pay her own bills, such as her car note and the mortgage on her Arkansas home, as well as marital expenses such as groceries, dinners, and household items. This account was completely used up during the parties' marriage.

Wife did not deny that, at times, she had emotional outbursts and acted in an inappropriate manner. She claimed that Husband provoked these incidents of anger and that he was physically abusive during the marriage. Wife described an argument in which Husband pushed her down and "busted up my face and started kicking me." Photographs of Wife's bruised legs were submitted into evidence to support this claim. She acknowledged the video recordings of her that Husband submitted into evidence, but explained that they were taken without her knowledge. Typically, she asserted, Husband would go out drinking at a bar, come home around 3:00 a.m., initiate a conversation with her while she was in bed, and then record the ensuing incident.

When Wife was asked about the account that she opened at Regions Bank in her name "d/b/a Gorbet Construction," she declined to answer and invoked her Fifth Amendment right not to incriminate herself. She did assert, however, that anything that had been taken was returned.

Wife's proposed property distribution listed the Willow Green home in Jackson as marital property. Wife testified that, in early June 2010, she and Husband and their daughters selected that house to live in as a family. She said that she offered to come to the closing on the home, but Husband told her that there was no need for her to be there, adding they could "add [her] name at any time on the title." Wife stated that Husband never indicated to her that the house was his separate property or that she had no ownership interest in it. She said that she willingly gave her car to workmen in exchange for $2,000 worth of stonework/brickwork that was performed on the house. Wife proposed that she and Husband share equally in the equity of the house.

Wife's proposed property distribution also listed the San Arbor property as marital property. She claimed that she and Husband purchased that lot with the intent to someday build a home on it for themselves. She described going to the bank together to get a loan for the lot, and noted that the $16,000 down payment on the property was made during the marriage out of the LLC's Commercial Bank account.

Wife also claimed that the cash value of Husband's whole-life policy was marital property. Wife said that she and Husband together decided to pay $20,000 to convert the policy to a whole-life policy because it would earn a favorable interest rate. The $20,000 conversion cost, she stated, was paid out of the LLC Commercial Bank account. Based on her discussions with Husband prior to converting the policy, Wife mistakenly assumed that she was the beneficiary on that policy.

Wife asked the trial court to award spousal support "[j]ust until I can get back on my feet." During the ten or eleven years she worked in her job at the hospital in Arkansas, Wife said,

she had "worked [her]self up" to a position in which she earned over $32,000 per year.[5] After the parties separated, Wife called the hospital about getting her old job back, but she was informed that the hospital was in a "hiring freeze," and that even if she were rehired, she would not be able to regain her seniority status. Wife acknowledged that she has a bachelor's degree in speech pathology and audiology, but claimed that she would need a master's degree or special certification to get a job in that field. Wife claimed that she had used her best efforts to find a job in Arkansas while living in Jackson, but ultimately determined that she would need to live in Arkansas in order to get a job there. She also claimed that Husband had hindered her efforts to find employment by cutting off her phone, so prospective employers could not return her telephone calls. Other than Husband's temporary alimony payments, at the time of trial, Wife's only income was the $500 per month that she received in child support from her former husband.[6] She submitted into evidence a list of her monthly expenses, which indicated that her expenses exceeded her income by $2,790 per month.

Wife testified that the attorney fees she incurred in the divorce were substantially increased by Husband's decision not to be forthcoming in response to discovery about his relationship with his paramour. In response to Husband's denials, Wife said, she and her attorney attended hearings, conducted depositions, made telephone calls, reviewed telephone records, and engaged in other efforts to obtain proof of Husband's extramarital conduct. Wife also alleged that her attorney fees were increased unnecessarily by Husband's failure to comply with his obligation to pay temporary spousal support and his failure to maintain the marital home. In light of Husband's conduct, Wife's lack of resources, and Husband's ability to pay, Wife asked the trial court to award her attorney fees of $15,137.

On July 19, 2011, the trial court wrote an opinion letter setting out its decision. First, the trial court declared the parties divorced and restored Wife's maiden name. It attached to the letter a chart identifying, valuing, and classifying all of the property owned by the parties as either separate or marital. The trial court equitably divided all of the property that was classified as marital. Relevant to this appeal, the trial court classified as marital property three items that Husband had claimed as his separate property: (1) the Willow Green home, with equity of $60,400, (2) the San Arbor property, with equity of $16,000, and (3) Husband's whole-life insurance policy, with a cash value of $13,500. Of those assets, the trial court awarded Wife the following: $25,200 (42%) of the equity in the marital home; $8,000 (50%) of the equity in the San Arbor property; and $4,000 (30%) of the cash value of Husband's whole life insurance policy. In addition, the trial court awarded Wife

---

[5]Wife initially testified that she earned $37,000 per year in her job at the Arkansas hospital, but she later acknowledged her 2010 tax return, which showed that she earned just over $32,000 in 2009.

[6]Wife claimed that her daughter's father was $7,000 behind in his child support payments.

transitional alimony for two years — $1,700 per month in the first year, and $750 per month in the second year. The trial court reasoned that, although the marriage was one of short duration, Wife needed funds "to help bridge the gap for a certain period of time until she can reestablish [in Arkansas]," and "to soften the economic blow of the divorce . . . ." The trial court also awarded Wife attorney fees of $8,000 as alimony *in solido* based on its finding that Husband's conduct during the divorce enhanced Wife's fees, and because requiring Wife to pay all of her attorney fees would negatively impact her ability to reestablish in Arkansas. Finally, the trial court ordered Husband to pay Wife $2,500 to defray her moving expenses. On August 9, 2011, the trial court entered a final decree of divorce incorporating its letter ruling in total. From this order, Husband now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

Husband raises the following issues on appeal:

(1) Did the trial court err in its award of transitional alimony to Wife?
(2) Did the trial court err in its classification of the marital home, the San Arbor property, and Husband's whole-life insurance policy as marital property, rather than separate property?
(3) Did the trial court err in awarding attorney fees to Wife as alimony *in solido*?
(4) Did the trial court err in awarding Wife $2,500 in moving expenses?

We review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001); ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984). When "the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." ***Heffington v. Heffington***, No. M2009-00434-COA-R3-CV, 2010 WL 623629, at *2 (Tenn. Ct. App. Feb. 19, 2010) (citing ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002)). We review a trial court's conclusions of law *de novo*, with no presumption of correctness. ***Whaley v. Perkins***, 197 S.W.3d 665, 670 (Tenn. 2006); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993).

## ANALYSIS

### Transitional Alimony

Husband first challenges the trial court's award of transitional alimony to Wife. He emphasizes that this was a marriage of short duration; the parties were married only 220 days

before they separated. Husband also notes that Wife received $25,620 in temporary alimony before trial, which included $2,055 per month paid directly to her, as well as Husband's payment of numerous bills for Wife's benefit. He argues that, during all of this time, Wife has had the ability to earn a living, given her education and past work experience, pointing out that she earned over $32,000 per year at her former job. Husband insinuates that, after the marriage failed, Wife's efforts to obtain work in Arkansas were perfunctory, noting that Wife frequently traveled back to Arkansas for visits but "never arranged for an interview" while there. Husband challenges the trial court's credibility determination in favor of Wife, particularly in light of Wife's attempted thievery by opening a Regions Bank account with checks made out to Gorbet Construction. For these reasons, Husband argues, the facts of this case do not support the trial court's decision to award Wife transitional alimony.

Under the Tennessee statutes governing alimony, a trial court is authorized to award alimony in divorce cases "to be paid by one spouse to or for the benefit of the other, or out of either spouse's property, according to the nature of the case and the circumstances of the parties." Tenn. Code Ann. § 36-5-121(a) (Supp. 2012). The statute provides: "The court may fix some definite amount or amounts to be paid in monthly, semimonthly or weekly installments, or otherwise, as the circumstances may warrant." *Id.* All relevant factors, including the statutory factors listed in Tennessee Code Annotated § 36-5-121(i), must be considered in determining whether alimony should be awarded to the relatively disadvantaged spouse and, if so, "the nature, amount, length of term, and manner of payment" of such an award.

The most important factors for a trial court faced with an alimony decision are the obligee spouse's need for the alimony and the obligor spouse's ability to pay. ***Bogan***, 60 S.W.3d at 730; ***Riggs v. Riggs***, 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007). The trial court "is afforded wide discretion regarding the award of spousal support, and we will reverse the court's findings only upon determining that such discretion 'has manifestly been abused.'" ***Hill v. Hill***, M2007-00471-COA-R3-CV, 2008 WL 1822453, at *7 (Tenn. Ct. App. Apr. 23, 2008) (citing ***Hanover v. Hanover***, 775 S.W.2d 612, 617 (Tenn. Ct. App. 1989)).

The statute specifically authorizes trial courts to award "transitional" alimony where warranted. Tenn. Code Ann. § 36-5-121(d)(1). Transitional alimony is appropriate "when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce . . . ." Tenn. Code Ann. § 36-5-121(g). In this case, the trial court explained that, although this was admittedly a short marriage, Wife was in need of transitional alimony:

> While the Court is aware that this is a short marriage, Wife is temporarily economically disadvantaged from the Husband, and has been detrimentally effected [sic] by the breakdown of the marriage more so than normal since she

gave up her job and her living situation in Arkansas to move to Jackson with her Husband. As a result, she must go back and start over. She will need funds to help bridge the gap for a certain period of time until she can reestablish. It is appropriate that Husband contribute to Wife in order to soften the economic blow of the divorce on the Wife. Husband has sufficient funds to pay transitional alimony.

We first dispense with Husband's argument that we should disregard the trial court's credibility determinations in this case. The trial court is afforded wide discretion in assessing witnesses' credibility, and we are bound by its credibility determinations in the absence of clear and convincing evidence to the contrary. *Sullivan v. Sullivan*, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002). Wife's actions with respect to the Regions Bank account, while dubious, do not amount to the clear and convincing evidence necessary for us to put aside the trial court's credibility findings. Thus, we consider the evidence in the record, giving appropriate deference to the trial court's view of the parties' credibility.

On the propriety of the trial court's award, Husband rightly emphasizes the short duration of the marriage and the fact that Wife is educated and has ample work experience to support herself. Nevertheless, we are not persuaded that the trial court abused its discretion in awarding transitional alimony under the circumstances of this case. When the parties decided to marry, Wife moved from her home state and left a stable job with eleven years of seniority to start a life with Husband in Jackson, Tennessee. Thus, as noted by the trial court, Wife was uprooted from her home and job in Arkansas because of the marriage, and as a consequence suffered more than the normal amount of detrimental effect from the demise of the marriage. Wife testified that her former job in Arkansas was unavailable, and that even if she were rehired, the seniority status she had earned would be forfeited. She testified that her attempts to find employment in Arkansas had thus far been fruitless, and that she had concluded that she could not find a job in Arkansas until she completed her move there. In our view, this is precisely the type of situation for which transitional alimony was intended.

In the alternative, Husband argues that, even if this Court holds that the trial court did not err in awarding transitional alimony, the amount of alimony award was unwarranted. We disagree; we find that the amount awarded was well within the trial court's discretion. An award of $1,700 per month for one year helps enable Wife to pay her house note and her car note for the first year, while leaving her only about $700 per month for all of her other expenses. According to the evidence in the record on Wife's reported expenses, this amount of transitional alimony still leaves her with a shortfall of about $1,000 per month. The stepped-down award of $750 per month in the second year is not unreasonable to ease her transition, and the evidence indicates that this amount is well within Husband's means to pay.

Under the circumstances, we find no abuse of discretion in the trial court's award of transitional alimony.

## Classification of Property

Husband next challenges the trial court's holding that several disputed properties were marital property. Our Supreme Court has explained why the classification of the parties' property is key to the equitable division of property in a divorce case:

> Tennessee is a "dual property" state because its domestic relations law recognizes both "marital property" and "separate property." *See generally* Tenn. Code Ann. § 36-4-121; ***Eldridge v. Eldridge***, 137 S.W.3d 1, 12 (Tenn. Ct. App. 2002). When a married couple seeks a divorce, the "marital property" must be divided equitably between them, without regard to fault on the part of either party. Tenn. Code Ann. § 36-4-121(a)(1). "Separate property" is not part of the marital estate and is therefore not subject to division. ***See Cutsinger***, 917 S.W.2d at 241. Thus, it is imperative that the parties, the trial court, or both identify all of the assets possessed by the divorcing parties as either marital or separate so that a proper division can be accomplished.

***Snodgrass v. Snodgrass,*** 295 S.W.3d 240, 246 (Tenn. 2009). Broadly speaking, "separate property" is "[a]ll real and personal property owned by a spouse before marriage . . . ." Tenn. Code Ann. § 36-4-121(b)(2)(A). "Marital property" is defined as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce . . . ." Tenn. Code Ann. § 36-4-121(b)(1)(A). As discussed below, a party's separate property may become marital property via the doctrine of comingling or the doctrine of transmutation.

The trial court's classification and division of property is a finding of fact, which we presume to be correct unless the evidence preponderates otherwise. ***Dunlap v. Dunlap***, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998); ***Dellinger v. Dellinger***, 958 S.W.2d 778, 780 (Tenn. Ct. App. 1997).

The properties that Husband argues were erroneously classified as marital property are: (1) the Willow Green home, (2) the San Arbor property, and (3) Husband's whole-life insurance policy. We will address each of these items in turn.

*Willow Green Home*

The trial court held that the home on Willow Green, in which the parties lived together, was Husband's separate property when it was purchased, but that it became marital property by virtue of transmutation. In its letter ruling, the trial court stated that, "[p]rior to the marriage, the parties jointly picked out [the Willow Green house] to be their marital home," and that the house "purchase closed one week prior to the marriage and they moved in." The trial court's attachment to the letter ruling summarized the factual findings that formed the basis for its conclusion that the house had become marital property through transmutation:

> Bought one week prior to marriage–Wife & Husband selected it–Moved in after marriage–Utilized as marital home–Mortgage paid by Husband with money earned during marriage–Marital Property by virtue of Transmutation.

The trial court determined that the marital home was worth $291,900, and that the parties had $60,400 equity in the home. Wife was awarded $25,200, 42% of the equity in the home.

Husband argues that the evidence preponderates against the trial court's finding that the Willow Green home was transmuted into marital property, because the home was purchased in his name only, and he lived with Wife in the home for only 220 days. He claims that transmutation is not triggered solely based on the fact that Husband and Wife are residing in the property together. *See Patton v. Patton*, No. 03A01-9601-CH-00001, 1996 WL 377087, at *2 (Tenn. Ct. App. July 8, 1996) (finding that separate property did not become marital property simply because parties lived in the home together for nine years, when the evidence showed that "husband intended that this property be his separate property").

"[S]eparate property can become part of the marital estate due to the parties' treatment of the separate property." *Eldridge v. Eldridge*, 137 S.W.3d 1, 13 (Tenn. Ct. App. 2002). Depending on how the property is treated, separate property can become marital property either through the doctrines of commingling or transmutation. *Id.* The related doctrines of commingling and transmutation were explained in *Langschmidt v. Langschmidt*:

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also

upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

81 S.W.3d 741, 747 (Tenn. 2002) (quoting 2 Homer H. Clark, *The Law of Domestic Relations in the United States* § 16.2 at 185 (2d ed. 1987)); *see Batson v. Batson*, 769 S.W.2d 849, 858 (Tenn. Ct. App. 1988); *see also Snodgrass,* 295 S.W.3d at 256-57.

In our view, the evidence in the record supports the trial court's finding that the Willow Green home became marital property through the doctrine of transmutation. As noted by the trial court, the house began as separate property; it was purchased by Husband prior to the marriage and is titled in his name only. However, it is undisputed that Husband and Wife selected the house together, while they were engaged to be married, for the purpose of living in it together with their daughters as a family. They in fact moved into the home together after they married; Husband paid the mortgage with funds earned during the marriage, and Husband acknowledged that Wife contributed her vehicle as payment for work done on the home. Unlike the *Patton* case cited by Husband, in the case at bar, Husband submitted no evidence indicating that he intended to keep this property as his separate property after he married Wife. *See Patton,* 1996 WL 377087, at *2. Rather, in the instant case, Husband's intent to keep the home as his separate property surfaced only after the demise of the marriage.

Accordingly, we affirm the trial court's holding that the Willow Green home in Jackson became marital property through the doctrine of transmutation.[7]

### *The San Arbor Property*

The trial court held that the undeveloped lot at 25 San Arbor was marital property. In the attachment to the trial court's letter ruling, its notation on this property states: "Unimproved lot purchased during marriage — Husband's company paid $16,000 down and financed the balance — This is Marital Property." The summary of facts in the trial court's letter ruling states: "Since Husband was the sole member of the [Gorbet Construction] LLC, it was normal for him to pay personal expenses out of the company's account, both prior to and after the marriage." The trial court determined that the San Arbor property was worth

---

[7]Husband does not challenge the proportion of the value of the marital home that was awarded to Wife; rather, he argues in his appellate brief that the trial court erred "in awarding [W]ife any portion of the property" based on its classification of the home as marital property.

$72,000, and that the parties had $16,000 equity in it. The trial court awarded Wife $8,000, 50% of the equity in the property.

Husband argues that the evidence preponderates against the trial court's finding that the San Arbor property was marital property subject to equitable division. He asserts that, as the trial court found, the property was purchased by Gorbet Construction – the LLC, not Husband individually – with money from the LLC's Commercial Bank account. Husband claims that Wife had no interest in the construction company, nor did she have any interest in the Gorbet Construction bank account. Because the lot was purchased with separate funds owned entirely by the business, Husband insists, the lot was separate and should have been classified as such.

In response, Wife asserts that the lot is marital property because it was purchased during the marriage with marital funds. She points out that the bank account used to purchase this property was also used as a personal account by Husband. All of the funds earned by Husband during the marriage were deposited into this account, and personal bills were paid during the marriage out of this account. Therefore, Wife argues, "[b]ecause the funds used to purchase [the property] were either proceeds from sales made during the marriage or commingled with such proceeds, the funds, themselves, were marital property and any purchase made [with] those funds is similarly marital property subject to property division by the Court."

As we have indicated, marital property is "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage . . . ." Tenn. Code Ann. § 36-4-121(b)(1)(A). Thus, the money Husband earned through Gorbet Construction during the marriage was marital property. *Wade v. Wade*, 897 S.W.2d 702, 716 (Tenn. Ct. App. 1994). By the same token, property purchased during the marriage with marital earnings is marital property, absent evidence that the property was intended to be the separate property of one spouse. *Id.* at 717.

As noted above, Husband's earnings during the marriage constituted marital property. Moreover, Husband's business earnings were deposited into the Gorbet Construction Commercial Bank checking account, out of which he paid all of his personal bills, both before and after the marriage. The $16,000 down payment for the San Arbor property was made with money from the Commercial Bank account, which contained Husband's earnings, *i.e.*, marital property. The San Arbor property was acquired during the marriage. Under all

of these circumstances, we cannot conclude that the evidence preponderates against the trial court's finding that the San Arbor property should be classified as marital property.[8]

### Husband's Whole-Life Insurance Policy

The trial court held that the cash value of Husband's whole-life insurance policy was a marital asset. It noted, however, that Wife made no monetary contribution to the policy. Consistent with Husband's testimony, the trial court found that the cash value of the policy was $13,500. It awarded Wife $4,000, 30% of the cash value, and awarded Husband $9,500, 70% of the cash value.[9]

Husband argues that the trial court erred in classifying the whole-life policy as marital property, because the policy was initially purchased when he divorced his first wife, and it was intended solely for the benefit of his daughter. Wife was never made the beneficiary of this policy, nor was she ever intended to be the beneficiary. Therefore, Husband maintains, because the policy came into existence prior to the marriage, and because Wife made no monetary contribution to the policy, the policy cannot be classified as marital property.

The undisputed evidence in the record shows that, during Husband's marriage to Wife, Husband paid $20,000 to convert the pre-existing term life insurance policy into a whole-life policy. Once the term policy was converted to a whole-life policy, it became an asset to the policyholder, and it had a present cash value. As with the San Arbor property, this asset was acquired with funds from the LLC Commercial Bank checking account, which contained the monies Husband earned during the marriage. Thus, the whole-life policy was acquired during the marriage with marital funds.

Under all of these circumstances, we cannot conclude that the evidence preponderates against the trial court's decision to classify the term-life policy as marital property.

---

[8]We are mindful that the trial court classified the LLC's Commercial Bank account as Husband's separate property. The trial court's classification of the Commercial Bank account as separate was not directly challenged on appeal. However, the undisputed evidence shows that Husband's earnings during the marriage – which are marital property – were deposited into this account. "[W]hatever Husband earned during the marriage, regardless of the bank account into which it was deposited, remains marital property." *Wade*, 897 S.W.2d at 716. The trial court noted specifically that Husband treated the LLC account as both a business and a personal account, and it is undisputed that the San Arbor property was purchased with those funds during the marriage. While we note this inconsistency in the trial court's findings, the preponderance of the evidence clearly supports the trial court's finding that the San Arbor property was marital property.

[9]Husband does not challenge the trial court's equitable division of the value of the policy, only its classification as marital property.

**Attorney Fees as Alimony *In Solido***

The trial court awarded Wife $8,000 in attorney fees as alimony *in solido*. It explained that it made the award because Wife's "fees have been enhanced by virtue of the Husband's conduct during the pendency of the divorce," and because, "[w]hile Wife will have some funds available to her, she will not have sufficient funds to compensate her attorney for erecting a proper defense and prosecution of her Counter-Complaint." The trial court further reasoned that, "[t]o require [Wife] to pay all of her fees would impact her ability to reestablish after the divorce."

Husband argues that the trial court abused its discretion in awarding Wife $8,000 in attorney fees as alimony *in solido*, because she had already received over $10,000 in alimony *pendente lite*, and she had also received other benefits by virtue of the fact that Husband paid all of her bills during the pendency of the litigation. Husband also asserts that Wife received enough transitional alimony out of which to pay her attorney fees; he points out that, by the end of the second year, Wife would have received a total of $29,400 in transitional alimony. In addition, Wife was awarded the Arkansas home as her separate property, with equity of $36,000, her car with equity of $2,950, and other property out of which she could pay her attorney fees. Therefore, Husband argues, the trial court erred in awarding Wife attorney fees as alimony *in solido*.

The decision about whether to award attorney fees as alimony *in solido* is within the sound discretion of the trial court, and such an award will not be disturbed on appeal unless the evidence preponderates against factual findings that support the trial court's decision. ***Kincaid v. Kincaid***, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995); ***Storey v. Storey***, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992). As with any alimony award, in deciding whether to award attorney fees as alimony *in solido*, the trial court should consider the factors enumerated in Section 36-5-121(i). ***Gonsewski v. Gonsewski***, 350 S.W.3d 99, 113 (Tenn. 2011). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney fees and expenses, but such an award is appropriate where the disadvantaged spouse lacks sufficient funds to pay his or her own fees. ***Id.*** In addition, a trial court may base an award of attorney fees on a finding that the attorney fees incurred by one spouse were enhanced by the other spouse's litigious conduct or obstructive tactics. ***See Gilliam v. Gilliam***, 776 S.W.2d 81, 86-87 (Tenn. Ct. App. 1989).

We find that there is ample evidence in the record to support the award of attorney fees as alimony *in solido*. At the time of trial, Wife had no income other than the transitional alimony awarded and the somewhat erratic child support payments from her former husband. The trial court correctly observed that requiring Wife to shoulder the total amount of the attorney fees she incurred would negatively impact her ability to reestablish herself in

Arkansas after the parties' divorce. Moreover, Husband conveniently ignores the trial court's determination that Wife's fees were enhanced by his conduct in discovery on the question of his infidelity, which determination is supported in the record.

Based on our review of the record, we find no abuse of the trial court's discretion in awarding Wife $8,000 as alimony *in solido*.

## Moving Expenses

Finally, Husband argues that the trial court erred in awarding Wife $2,500 in moving expenses. He contends that the amount of the award was based on speculative and unreliable estimates. We disagree. At trial, Husband conceded that he should pay Wife's moving expenses, and he testified that he received an estimate from a moving company of between $1,700 and $2,000 to complete the move. Wife testified that she obtained estimates from four moving companies, and that the average cost from all four was $2,500. The trial court was entitled to credit Wife's testimony on this issue. Therefore, we find no error in the trial court's award to Wife of $2,500 in moving expenses.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Damon Gorbet and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

-18-